### HALLAM et al. v. BAILEY.

No. 6754—Opinion Filed July 31, 1917.

(166 Pac. 874.)

**1. Evidence—Lost Documents—Parol Evidence.**

Before oral testimony is admissible as to contents of lost written instruments, which, with reasonable diligence, cannot be produced, it is necessary to prove by competent evidence that such instruments were actually executed and delivered by the person or persons sought to be bound thereby.

**2. Principal and Agent—Authority of Agent—Liability of Third Person.**

Authority in an agent to deliver a deed to real property and receive the consideration therefor does not warrant the agent to contract for such consideration to be conveyed to him in his own name, nor to treat the money or property received or to be received as his own. If the grantee in such deed assists such agent to take the consideration in his own name, or to handle or treat such consideration as his own, the grantee is a party to fraud on the grantor, and cannot escape the consequences of his conduct on the theory that the grantor is bound by the acts of his agent.

**3. Fraud—Principal and Agent—Right of Principal.**

Fraud upon an agent in matters connected with the subject of the agency is fraud on the principal, and if such fraud is actionable, the principal has the same right of action against the defrauder that he would have if the transactions were had personally with the principal.

**4. Corporations—Real Estate—Acquisition.**

A corporation can only acquire real estate in the collection of debts owing to it, and such as is necessary in conducting its business. A contract with a distillery corporation, whereby such corporation agrees to transfer all of its property or all of its capital stock for lands to be conveyed to a trustee for the use and benefit of the corporation, cannot be enforced against the corporation, and is therefore not binding on either party to the contract. In a proper action, deeds to land executed in pursuance of such contract may be canceled at any time before the corporation executes its part of the contract.

**5. Escrows—Delivery of Deed—Cancellation of Record.**

When a deed to land is placed in escrow on condition that the same shall be delivered only on the forthcoming of the consideration agreed upon for such land, and the deed is placed of record without the consent of the grantor in the deed, and before the fulfillment of the condition of the escrow, no title to the land passes thereby; and in a proper action brought by the grantor the deed and the record thereof may be canceled.

**6. Cancellation of Instruments—Actions—Defenses.**

Where the facts warrant the rescission of a contract for the sale or exchange of property on the ground of fraud, the defendants, in an action brought for cancellation of deed made in pursuance of such contract, cannot urge successfully as a defense that the plaintiff, as a condition precedent to obtain the relief sought, has not placed the defendants in statu quo by removing incumbrances against the defendants' property, the title to which has never passed to the plaintiff, when such incumbrances were effected with the advice and consent of the defendants as a part of a system of fraud practiced by the defendants upon the plaintiff.

(Syllabus by Stewart, C.)

Error from District Court, Nowata County; T. L. Brown, Judge.

Action by Rose E. Bailey against Alfred Hallam and others. There was a judgment for plaintiff, and defendants bring error. Affirmed.

Sears & Snyder and Glass & Weaver, for plaintiffs in error.

J. C. Denton, for defendant in error.

Opinion by STEWART, C. The defendants appeal from a judgment of the district court of Nowata county, canceling deed to certain lands made by the plaintiff to the defendant Alfred Hallam as trustee for the defendant Crystal Lake Distillery Company, a corporation. The evidence in this case shows that the Crystal Lake Distillery Company is a corporation, doing business at Sioux City, Neb.; that Alfred Hallam is president of such corporation and the defendant D. L. Fairbank is one of the active directors; that, this corporation owns a distillery plant in Sioux City; that there is another corporation at Sioux City called Crystal Lake Distillery, Incorporated, having some of the same stockholders as the corporation first named; the said Fairbank being a stockholder in each of the corporations. The defendants claim that the Crystal Lake Distillery Company is the "owning corporation," and that the Crystal Lake Distillery, Incorporated, is the "operating corporation." Charles J. Ray was secretary of one of the corporations, and from the evidence, active in the affairs of both. F. D. Bailey is husband of the plaintiff, and merely a nominal defendant in the case. While the testimony is in conflict as to the status of the defendant Charles Watson, we think the weight of the evidence shows that he was in collusion with, and was acting as the agent of, Hallam, Ray, Fairbank, and the two corporations named, as to the matters involved in this action. There are five companion cases pending here on appeal, including the instant case, involving the same transaction and practically the same facts; the other cases being No. 6751, Alfred Hallam et al. v. Willie Claggett, 66 Okla.—, 167 Pac. 215; No. 6752, Alfred Hallam et al. v. Ruth Claggett, 66 Okla. 53, 166 Pac. 880; No. 6753, Alfred Hallam et al. v. Tessie M. Claggett, 66 Okla. 52, 166 Pac. 879; No. 6755, Alfred Hallem et al. v. Jane Claggett, 66 Okla. 52, 166 Pac. 879. It appears that Rose E. Bailey, Willie Claggett, Ruth Claggett, Tessie M. Claggett, and Jane Claggett are ignorant negroes, each related to the others, either by consanguinity or affinity. F. D. Bailey is a negro and the husband of the plaintiff, Rose E. Bailey. Charles C. Claggett is a negro and the husband of Ruth Claggett, the father of Tessie M. Claggett, the stepson of Jane Claggett, the half-brother of Rose E. Bailey, and "stepuncle" of Willie Claggett. All the negroes named except F. D. Bailey and Charles C. Claggett are Cherokee freedmen having alienable lands in Nowata county, upon which numerous oil wells are in operation. There are also minor children belonging to the Claggett family who hold valuable tracts of land, the total acreage belonging to both adults and minors being about 690 acres, the acreage belonging to the adults being about 400 acres.

In July, 1912, Charles Watson, smooth and plausible, appeared in Nowata county, claiming to represent wealthy investors in the North, and made it convenient to meet Charles C. Claggett, who, it seems, in a general way, was leader of the dusky clan Claggett. Watson informed Claggett that he could get $135 per acre for all of the land, and they arranged to meet in Coffeyville, Kan., for the purpose of going North to meet prospective purchasers; Watson agreeing to pay all of the expenses. Arriving at Coffeyville, Watson made a pretext that some person at Lanapah, near Coffeyville, owed him $1,800, which he desired to collect. Hiring a livery rig, the two then went to Lanapah, but, of course did not find the debtor. Watson pleaded temporary financial embarrassment; he showed Claggett what appeared to be a deed to 770 acres of land in Missouri, and asked the negro to advance him some money and hold the deed. Claggett furnished Watson $350, and they started for Redfield, S. D., where Watson said he had two old maid sisters who were very wealthy, and with whom they might make a deal. The negro had little experience in traveling. After traveling all night, they awoke in Sioux City. Watson said that he knew people there with all kinds of money anxious for Oklahoma land; that they would get off there, and if they did not find some one, they would go to Dakota. He took the negro to breakfast and to the Vendome Hotel, afterwards introducing him to the defendants Hallam and Fairbank. Claggett was shown the distillery plant and told of great profits in the distillery business. It was represented to him that persons were coming from Peoria and Cincinnati to offer $85,000 for the plant, but that Hallam asked $100,000, and that the plant was worth it. Watson acted as a go-between, carrying word back and forth

from Hallam to the negro. Fairbank told how they fed cattle from the slop at the distillery, and how much money was made in that way. The negro was cajoled and flattered, being taken around and introduced to bankers and prominent business men of the city and otherwise treated as an honored and distinguished guest. He was told at the bank where Hallam did business that there was preferred stock of the distillery to the amount of $40,000, good at any bank dollar for dollar; that the common stock, amounting to $60,000, had a borrowing value of from 40 to 60 per cent. The negro told Hallam that some of those who owned the land would require a cash payment of $75 and some $100 per acre; that it would take $73,000 to obtain the land. It was agreed that the money would be obtained for him, and he was told to get the adult deeds and the money would be ready. Claggett wired his brother-in-law, Fred D. Bailey, to come and look over the proposition. Bailey came and was treated with all the consideration and respect shown Claggett. It was represented by Hallam and Watson that they would get $30,000 in Sioux City and the balance of the $73,000 at Omaha; that some people at Peoria were going to give $95,000 for the plant, and would be in Sioux City in a short time. It was agreed that Watson, Hallam, Fairbank and the negroes would go back to Nowata to look over the land.

In the meantime, a purported contract was drawn up between the Crystal Lake Distillery Company on one hand and Charles C. Claggett on the other, by the terms of which Claggett was to be paid $138,000 for the land, he agreeing to accept $100,000 of the capital stock of the Crystal Lake Distillery Company at par as part payment, the remaining $38,000 to be paid by the Crystal Lake Distillery Company out of oil royalties which were being collected from leases on the land to be conveyed. Watson, claiming that he had been robbed, asked Claggett to furnish the expenses of the trip for the party back to Nowata, saying that he was getting a commission out of Hallam and the distillery company, and that he would repay the money. Claggett agreed, and Fairbank, Hallam, Watson, Claggett, and Bailey proceeded southward at the negro's expense. Arriving in Nowata county, these white gentlemen spent some time inspecting the land and being entertained in the negro's home.

On one occasion, when they had accepted Claggett's hospitality for supper and lodging, Hallam surreptitiously departed before breakfast. The host did not understand this breach of the amenities, but was told by Watson that Hallam was a funny old fellow, and was about to back out, and that it would be necessary to get Dave (meaning Fairbank) to talk to him, and that they would have to give Fairbank $1,000 to make the deal. The negro refused, but Watson said that he would make good the thousand dollars out of his commission of $2,500 to be paid by the distillery company. Claggett finally consented, and the money, as we will show, was paid later. Fairbank in his testimony admits that he gave Watson half of this money. After considerable further negotiations Hallam drew up a new contract between the Crystal Lake Distillery Company and Claggett, by the terms of which Claggett waived the $38,000 difference at first agreed to be paid by the distillery company and agreed upon an even exchange. This contract was signed by Claggett, and also by Hallam as president of the corporation. It was still understood that Hallam and Watson were to raise the $73,000 on the plant to be paid to the owners of the land. Watson, Hallam, and Fairbank returned to Sioux City. On arriving there Watson sent a telegram to Claggett, saying that he had the first $30,000 ready. Bailey again went to Sioux City, and, finding that the money was not forthcoming, returned home. They received a letter from Hallam asking why they had left so soon and inviting them to come back. Watson sent another telegram, advising Claggett to have deeds recorded, that part of the funds were on hand, and that the balance was at Omaha. The negroes returned to Sioux City, and demanded the money before the deeds should be recorded.

Several modifications of the contract between the Crystal Lake Distillery Company and Claggett were written out by Hallam and signed by Claggett from time to time. one of which was to the effect that the Crystal Lake Distillery Company would convey the property of the corporation to Claggett instead of having the capital stock transferred to him. Claggett and Bailey kept demanding the money agreed upon, and at the suggestion of Hallam, Watson, and others it was agreed that the capital stock should be put up with Hallam's banker who, it was said, would advance $30,000, sufficient to pay for the land of the adults. The negroes were advised that, when the deeds to the land of the minors were delivered, all of the stock would be turned over, and the remainder of the money furnished. On the faith of this arrangement Claggett

was induced by Hallam and Watson to send a telegram, asking the law firm of Glass & Weaver, with whom the adult deeds had been left in escrow, advising that such deeds be placed of record. The deeds were placed of record, and the register of deeds of No-wata county wired such information to Hallam. Claggett then went to the bank, thinking that he would receive the $30,000, but was informed that the money would not be paid until all of the deeds were delivered. In the meantime Watson and Hallam had induced Bailey and Claggett to purchase office furniture belonging to Hallam to the extent of several hundred dollars by leading them to believe that a vast land business could be worked up between Northern buyers and owners of Oklahoma land. Watson and the negroes formed a partnership in the real estate business, Watson tickling the vanity of the sons of Ham by causing spectacular letter heads to be printed, giving in bold type the personnel of the partnership. About this time, Fairbank began to demand the $1,000 which had been promised him to induce his associates to make the deal. He threatened to garnishee the stock which had been placed in the bank. Claggett's funds had become exhausted, and he told Watson that he had no money. Watson said:

"We will have to have some money so we can pay Fairbank. They will have to let me have that out of my commission; they have not paid me yet"

The next day, in the presence of Claggett, Watson asked Hallam about his commission. Hallam said he would not pay it until the deal was closed. Watson then took Claggett to one Clark, who, in our opinion, from all the circumstances in evidence, was in collusion with the others to defraud the negroes. They proposed to borrow $1,500 from Clark, which Clark agreed to lend. Clark charged 10 per cent. interest, and also deducted $150 for commission, as he called it. The capital stock which had been placed in the bank was delivered to Clark as collateral, and Claggett executed a note for $1,500, drawing 10 per cent. interest. receiving $1,350 for the note. About this time Hallam and Fairbank deceived Claggett into believing that it was his duty to pay to them about $200 that had been paid by the Crystal Lake Distillery, insurance on its property, and the same was paid by Claggett. Out of $1,350 received from Clark the negro paid Fairbank $900, having previously paid him $100. The balance was used in payment of board bills for himself and others. Claggett was then told he would have to go back home and secure the minor deeds be-

fore he could get the $30,000. He offered to furnish a bond for title, and it was agreed that if he would furnish a good bond for $25,000 for the fulfillment of his contract, the $30,000 and the balance of the money would be forthcoming. He then executed a bond as required, with sureties which are admitted to be first class, and the bond was approved by Hallam and associates. When he returned to Sioux City with the bond, he was told that, on account of the presidential election, money was "tight," and that the bank could not furnish the money. Clark again appears on the scene, and a pretended deal is worked up with Clark, by which Clark agrees to procure a loan of $15,000 for which Clark is to have $1,500 commission. Clark afterwards claimed that he had procured the loan, but in the course of further negotiations Claggett was told that the proposed lender was not willing to advance the money until the title of the land was settled.

It will be borne in mind that at no time up to the trial of the case was any of the capital stock in the corporation transferred to Claggett or to any one else and no deed to the property of the corporation was made and delivered. No change was made in the personnel of the stockholders or of the directors. Through all stages of the negotiations Hallam remained president. The evidence further shows that Watson and his confederates suggested to Claggett that the Crystal Lake Distillery Company, Incorporated, the "operating corporation," would not be able to continue in business, owing to temporary financial embarrassment, unless the corporation was assisted in a pecuniary way. It was then suggested that the Crystal Lake Distillery Company execute two notes, one for $10,000 and one for $20,000, to the Crystal Lake Distillery Company, Incorporated, and that the Crystal Lake Distillery Company, Incorporated, indorse the notes to the bank, the proceeds of the $10,000 note to be paid to Claggett, the remaining $20,000 to be used by the "operating corporation" for which the Crystal Lake Distillery Company, Incorporated, was to execute its non-negotiable note to Claggett for $20,000. Groping in darkness and trying to find the light, hoping against hope, Claggett and Bailey agreed to this proposition, and the notes were made and secured by a mortgage on the property of the Crystal Lake Distillery Company, said notes and mortgage being executed by Hallam as president and attested by the secretary of the corporation. The $10,000 note was offered to the bank to be cashed. Before purchas-

ing the same the bank, whose officers, it appears, were also in collusion with the arch-conspirators, required that Claggett sign his individual obligation for the amount, and that the $50,000 stock which was held by Clark to secure the $1,500 note be furnished as collateral. Clark was interviewed, and refused to surrender the stock unless Claggett would not only pay the note of $1,500 and interest, but also pay a commission of $1,500 on the proposed loan of $15,000 which Clark had failed to perfect. In order to get possession of the $50,-000 stock which the bank pretended to demand as collateral, Claggett submitted, and the stock was delivered to the bank. Clark received $3,010 and Claggett $6,990 of the proceeds of the $10,000 loan.

In the meantime Fairbank, who, the testimony shows, was an experienced cattle feeder, had purchased a number of cattle and fed them for market, using the slop from the distillery and other feed as was required. He tried to get Claggett and Bailey to take over the cattle, but they refused. Fairbank, however, claimed after selling the cattle, that he had sustained a loss of $1,000, and that, under contract with Watson, the negroes were responsible for this loss. The negroes refused to pay the amount. The deed to the minor's land having now been obtained by probate proceedings and placed in a bank at Nowata to be delivered in payment of the consideration, by some arrangement, not clearly shown by the evidence, it was thought the deeds could be obtained by raising about $5,000. Again recourse was had to the "operating corporation," and to Hallam's accommodating banker. Hallam had told Claggett that under the agreement signed, if the minor deeds were not obtained he (Hallam) would hold all the adult land, and would also collect the $25,000 bond. The unfortunate victim was in desperate straits, and, being at the mercy of his persecutors, was ready to do anything that offered a slight ray of hope. It was proposed that the note given by the "operating corporation" to Claggett be credited with $5,000, and that the bank be asked to purchase a note for such sum secured by the capital stock held as collateral, by the personal obligation of Claggett, and by the mortgage given on property of Crystal Lake Distillery Company. The bank, true to its friend Hallam and his conspirators, required a discount of $1,000 for cashing the $5,000 note, and, further, that Claggett settle with Fairbank for alleged loss in feeding the cattle as conditions precedent to purchasing the $5,000 note. By this time Claggett was thoroughly under the hypnotic spell; he executed a note to Fairbank for the pretended loss on the cattle, which note was accepted, and yielded to the other demands. The $4,000 received was deposited in the bank at Nowata, to be paid out when the minor deeds were delivered.

There is in evidence a statement of the assets and liabilities of the Crystal Lake Distillery, Incorporated, the "operating corporation," which shows that outside of $7,-265 credited as an asset under the head of "brands," which, we understand, means trade-marks of liquor, the liabilities exceed the assets by about $2,000. In other words, the "operating corporation" was hopelessly insolvent, and its obligations were worthless.

There is evidence to show that, of the $6,990 received by Claggett, as much as $4,000 was used by Watson, and that by various turns and pretexts on the part of Watson and the others, not only the amount received from the note, but the other funds of Claggett, were extracted until only $30 remained with which the deluded and despised negro, sadder but wiser, purchased a ticket home, his wisest act for many a day. The plaintiff has never received anything for her land.

The evidence further shows that, at the time the negotiations began, plaintiff and her mother, Jane Claggett, the defendant in error in cause No. 6755, before mentioned, were residing at New Westminster, British Columbia; that Fred D. Bailey, husband of the plaintiff, wrote, sending deeds to be executed by them to defendant Hallam; that the deeds were forwarded to Bailey with the understanding that they were to be delivered to Hallam only on the payment by Hallam of the sum of $75 per acre for the land conveyed. The evidence shows that Charles C. Claggett and Fred D. Bailey were paid a small sum as rent for the distillery property, which was disbursed under the supervision of Hallam, and that the adult landowners were victimized into signing orders in favor of Hallam for the payment of royalties on oil leases, the victims signing such orders without knowledge of the true state of affairs, and that Hallam collected considerable money from such source. Deeds from Willie Claggett, Tessie M. Claggett, and Ruth Claggett were obtained by Charles C. Claggett under the same agreement, Tessie M. Claggett and Ruth Claggett to receive $100 per acre and Willie Claggett to receive $75 per acre. All the deeds were placed in escrow with Glass & Weaver, attorneys at law of No-

wata, to be delivered and recorded upon the payment of the consideration. Through no fault of Glass & Weaver, but because of fraud perpetrated by Watson and Hallam in causing Claggett to send the telegram to Glass & Weaver, the deeds were recorded. The deeds to the minor lands were not recorded or delivered, and in the cases appealed such deeds are only incidentally involved.

The plaintiff is an ignorant and credulous negro woman, having valuable property rights in the state of Oklahoma, but she is entitled to every consideration in the courts of her country accorded to the highest citizen of the land; in fact, citizens in more exalted position have less need of help, being better able to protect themselves. If there is anything convincing in the brief of the defendants it is that, despite ingenious argument of able counsel, the necessary statement of facts in their brief shows that the defendants have been guilty of one of the most outrageous frauds known to the judicial annals of this state. Under the facts proved, instead of invoking assistance from the highest civil judicial tribunal of the state, the conspirators should don the proper uniform and take their place behind prison walls.

Much is said in the defendants' brief concerning the agency of Charles C. Claggett for these benighted victims. There is not a syllable of testimony in the record to show that the owners of the land ever agreed to accept anything but a cash consideration; nor is there any competent testimony to show that the plaintiff gave Charles C. Claggett power of attorney to deal with her land or to take any property either in his or her name in exchange therefor; nor does it appear that Claggett or any other person has ever received any money or other property for the land. Hallam testified that before he entered into any contract with Claggett, powers of attorney were exhibited to him by Claggett from each of the owners of the land; that such powers of attorney authorized Claggett to dispose of the lands as Claggett "saw fit." Fairbank testified that the powers of attorney authorized Claggett to "sell or trade the lands." The testimony concerning the powers of attorney and the purported terms thereof was objected to by the plaintiff, and exceptions were properly saved. The testimony is as inadmissible as it is unreasonable. Before oral testimony as to the contents of such instruments was admissible on the theory that defendants could not with reasonable diligence, procure the written evidence, it was further necessary to have proved that such instruments were duly executed by the parties to be bound thereby. There was no such testimony, not a witness nor any evidence to prove the execution, nor did any one testify as to familiarity with the handwriting of the purported signers and state that the signatures were in their handwriting. There is no competent testimony that Claggett or Bailey ever had powers of attorney as to the matters involved. If Charles C. Claggett or any one else were duly authorized to act as agent of the plaintiff and acted within the scope of his authority, his acts within such scope would bind the principal; but authority on the part of an agent to deliver deeds for money or other property does not authorize the agent to contract for the consideration to be conveyed to him in his own name, and does not authorize him to treat any consideration received, or to be received, as his property. If the grantee in such deeds assisted the agent to take the consideration in his own name, or handle and treat it as his own, or connived at such course, he worked a fraud on the grantor, and cannot escape liability on the theory that the principal is bound by the acts of such agent. It is evident that the grantee in this case was guilty of such fraud.

We may also observe that, if in negotiations with such agent, a fraud is perpetrated on the agent as to the matters so intrusted to the agent, the same would be a fraud on the principal. If Claggett had the power to dispose of the land as he "saw fit," as claimed by Hallam, the representations and conduct of the defendants, upon which, it appears, Claggett relied is of so fraudulent a nature that Claggett would not be bound by the contract of sale, and the same could be avoided either by him or his alleged principal.

One proposition seems to have been overlooked in the briefs. It is admitted by the pleadings that while the land involved was conveyed to Hallam, yet he was to hold the legal title in trust for the Crystal Lake Distillery Company. The contract for the exchange of properties is between Claggett and the corporation. Under the laws of this state, a corporation is prohibited from purchasing land not necessary to the conducting of its business, except that land may be temporarily acquired in collection of debts. In the absence of proof to the contrary, we must hold that the law of Nebraska is the same as ours. The contract in this case made by the corporation could not be enforced as against the corporation, and

when a contract cannot be enforced as to one of the parties, it may be avoided by the other. Brown et al. v. Wilson et al., 58 Okla. 392, 160 Pac. 94, L. R. A. 1917B, 1184. But the defendants claim that the contract is executed. It certainly cannot be said to be executed on the part of the corporation. It is not contended that either the capital stock or the property of the corporation has ever been transferred to the plaintiff or to any one for her. If such transfer were attempted, under the contract being discussed, any stockholder could successfully oppose the transfer on the ground mentioned. For such reason, if for no other, the deeds' should be canceled, but there are other reasons.

It is well settled by the decisions of this court that when the possession of an escrow is obtained without performance of the conditions upon which a delivery to the grantee is to be made, no title passes by reason of such delivery. Wood v. French, 39 Okla. 685, 136 Pac. 734; Powers v. Rude, 14 Okla. 381, 79 Pac. 89; Hunter Realty Co. v. Spencer et al., 21 Okla. 155, 95 Pac. 757, 17 L. R. A. (N. S.) 622. In the case at bar the deed was placed in escrow, and no delivery was to be made of the same until the payment of the consideration of $75 per acre. It appears that all of the adult deeds were fraudulently placed of record and in violation of the terms of the escrow agreement. Therefore the recording of the deeds was ineffectual to convey title, and the plaintiff is entitled to have the same canceled of record.

It is urged by the defendants that as a condition precedent to bringing the action, it was the duty of the plaintiff to place the defendant in statu quo. It does not appear that the plaintiff has received anything, either in the way of money or other property, from the defendants, and there is nothing to restore. As to an incumbrance against the distillery property incurred in the transaction had between the defendants and Claggett, we find that the evidence shows that no incumbrance has been placed against such property except on the advice and with the assistance of the defendants in this case. If, in fact, any bona fide incumbrance exists, the defendants, being parties thereto, are not in a position to complain. Nor does it appear that the plaintiff had anything to do with such incumbrance. From the circumstances in evidence, we believe the defendants in a breath could brush away every apparent incumbrance, but whether or not we are correct as to such belief, this court will not hold that the plaintiff is responsible for the same.

Finding no error on the part of the trial court, and that the judgment is supported by the weight of the evidence, the judgment is affirmed.

By the Court: It is so ordered.