### EQUITABLE ROYALTY CORPORATION v. PERRY et al.

No. 22940.    Jan. 22, 1935.

Rehearing Denied March 5, 1935.

Arrington & Evans and Jere G. Crowley, for plaintiff in error.

Winfield Scott, James A. Ingraham, and Paul R. Haunstein, for defendants in error.

PER CURIAM. This is an equitable action brought by Adah L. Perry against Russel Knott to cancel an oil and gas lease and royalty deed made by her to such defendant, said action being filed May 11, 1929. On November 17, 1930, the intervener, Equitable Royalty Corporation, inter-

vened in the cause, claiming that it was an innocent purchaser in good faith of the royalty deed just mentioned, and asked that it be adjudged such.

Trial was later had. The trial court found: (1) That both the oil and gas lease and the royalty deed made by plaintiff, Adah L. Perry, to the defendant, Knott, were obtained by fraud; (2) that the royalty company in purchasing the royalty deed had sufficient notice of certain facts contained in the probate records of the county and other public records which should have put a person of ordinary prudence on inquiry, and that if such inquiry had been made by it, it would have discovered the fraud employed in procuring both the above-named instruments; (3) that since both the oil and gas lease and royalty deed were taken down by the defendant in violation of an escrow agreement with the plaintiff, no valid delivery of the instruments was ever made to the defendant which would convey the title to him, and that the royalty company obtained no title to the royalty deed when it purchased it. The trial court canceled both the above conveyances and quieted the title of the plaintiff as against the intervener.

From this judgment the defendant Knott took no appeal, but the intervener, the Equitable Royalty Company, did, and the case is here now on the issues presented on this appeal by the intervener against the plaintiff.

1. The first proposition urged by intervener is:

"The court erred in not finding from the evidence and holding as a matter of law that the grantee performed the condition upon which the mineral deed and oil and gas lease were placed in escrow and therefore acquired good title."

We take it that this is merely a different phrasing of the contention that the judgment of the trial court is contrary to the clear weight of the evidence in holding that the oil and gas lease and the mineral deed executed by Adah L. Perry to the defendant, Knott, on April 16, 1929, were obtained by fraud and in violation of the escrow agreement between the parties under which both these instruments on that date were placed in escrow in a bank in Enid. We differ. It is true that the plaintiff, Mrs. Perry, in her version of what occurred and the conversations had between her and Knott and his associate, Osborn, leading up to and culminating in the execution of an oil and gas lease and mineral deed on her farm, was not corroborated by the testimony of any other witness present when such conversation was had. But it is clear to us, in reading the entire record carefully, that she was led by the defendant and his associate, Osborn, to execute both these instruments by fraudulent representations made by them to her; that she was led by them to deposit such instruments in the bank; and that the defendant took down both instruments in violation of the escrow.

We will not attempt to digest minutely and fully the evidence of the witnesses on this matter, for to do so would unreasonably expand this opinion. We shall state the pith of the same briefly, and sufficiently, we believe, to demonstrate that the judgment of the trial court on this proposition was right.

The quarter section of land in controversy is located in Garfield county and had been for years the homestead of the plaintiff and her husband, who died in 1914, leaving his wife with several children to rear. At the time this transaction occurred, the plaintiff still owned the farm, but was living in Enid. She was presumably of middle age or more and in bad health, undergoing the change of life with its usual distressing incidents, and in addition suffering from hemorrhoids and a diseased condition of the uterus caused by childbirth infection. Her family doctor testified that at the time this transaction occurred she was in such poor health and so nervous that she was not actually fit to transact any business.

Shortly before April 16th, a man by the name of Ward Osborn went out to the home of plaintiff. He had met her at the funeral of his mother in-law sometime before that. He told her that he had a friend there named Russell Knott who was engaged in buying and selling oil and gas leases, and that he would like to bring Knott out to see her. After some conversation she told him he might do so. On April 16, 1929, both of these men went to her home. She is a woman who has spent her life on a farm in rearing her children and, of course, knew nothing about oil and gas leases or royalty deeds or the effect thereof.

While Osborn introduced Knott as a friend of his, the actual truth was that he was a secret partner with Knott in this and other similar deals. Mrs. Perry says that Knott stated he wanted an oil and gas lease on her farm; that she told him she could not give a lease because the

place was still in the hands of the court (probate) and never had been settled, and that her minor son still had an interest in the place. Knott said, "We can fix that up." Either he or Osborn or both suggested that she could go into the guardianship case of her minor son and acquire his sixth interest in the homestead, or she could bring a suit in the district court in partition and obtain it. Knott said that a lawyer named O. W. Cromwell, "a good old soul" in Enid, would bring the suit for her and Knott would pay half of the expense of it. Knott said he would prepare the papers and leave them with his lawyer, Cromwell, and she could sign up when she went to town, and that the papers would be put in escrow until the partition suit was settled. Knott agreed, also, she says, to pay $200 bonus for the oil lease and the lease for ten years was to draw a rental of $1 per acre; that Knott stated to her that the papers should be put in escrow in the First National Bank for 60 days: that if she was not satisfied at the end of that time, the lease would be destroyed, but if she then wanted to lease it he would pay the $200 and take the lease.

It should be here stated that at this time Mrs. Perry owned by inheritance and otherwise five-sixths of this land, a one sixth outstanding in her minor son. She says that at the first conversation no definite arrangements were made. She stated that they wanted to think it over a few days; that a few days later Knott or his associate or both, and the attorney, Cromwell, began calling her up on the telephone and asking her to go down to Cromwell's office and execute the papers. Finally, one morning, being so called again, she got in to her car and went down to the office of Lawyer Cromwell, whom she had not met before. She said that in her haste she came away from home without her glasses; that without them she could not read printed matter at all; that Cromwell had there what he said was an oil and gas lease and another paper he called a contract; that she told him she was without her glasses and could not read it. She said they talked about the oil and gas lease, but the other paper was merely referred to by Cromwell as a contract. She says she asked Cromwell about starting the partition suit for her, and he stated he could not do so because he was Knott's lawyer. She states that he said that when the papers were executed by her they would

take them to the bank and escrow them under the arrangement she first had with Knott, by which the papers were to remain in escrow 60 days to enable her to bring the partition suit and thereby get the outstanding one sixth interest of her son. She said she asked Cromwell to read these papers, but he did not. He admits that he probably did not read them to her and he thought probably she did not read them. He says that he explained to her that all that was being done was that she was selling to Knott an undivided one-half interest in the oil and other minerals underlying her five-sixths interest in this land for $200, though he admits that she did sign an oil and gas lease to Knott for ten years at a rental of a dollar per acre.

It may here be stated that both Knott and Osborn tell substantially the same story of their conversations with her, to wit, that they told her they only wanted to buy the royalty, and that they wanted an oil lease so that it could be sold and rentals begin to run.

The plaintiff states that in Cromwell's office she finally signed what he called an oil and gas lease and contract, and he attached to these papers what he called a draft. That they went to the bank, put the papers in an envelope, and gave a young woman there the papers to hold in escrow. No formal escrow agreement was made or signed by the parties. Cromwell says that he dictated to the young woman certain language which she indorsed on the envelope, the dictation being in substance that "Mr. Knott was to pay the draft and take the papers when he was satisfied with the title," but he testified that he had lost this envelope. He admits that he did not read these papers to her though he knew she was there without her glasses and could not read them, and the substance of his statement to her was that Knott was buying the royalty for $200; that the papers would be placed in escrow, and that when he was satisfied with the title he would pay $200 and take up the draft. We do not consider the so-called draft of any particular importance in this case. It was made payable to her order, signed by Knott and drawn on the Liberty National Bank of Oklahoma City, but it never was in her possession or did she ever indorse it or have any control over it, and it was never cashed. We doubt if it could be properly called a draft in the commercial sense. We here quote it:

"Customer's Draft. Central National Bank

"Enid, Oklahoma.

"April 16, 1929.

"60 days after date, on approval of title and abstract brought down to date. Pay to the order of Adah L. Perry $200.00 Two Hundred and no/100 Dollars.

"The maker hereof (whether one or more) agrees to grant an extension of 30 days in case any requirements are requested by the attorney examining the title to the lease and royalty forwarded herewith for collection; one copy of said attorney's requirements to be delivered to the collecting bank within the time first above specified, and one copy to be mailed each to the forwarding bank and maker hereof within said time. The maker hereof agrees to furnish said requirements, if possible, within the time last above specified and further agrees to accept money in case draft is paid at any time before same is ordered returned by the forwarding bank. This draft is payment in full for oil and gas lease & royalty covering the following described land; Lots 3 & 4 and east half (E.½) of southwest quarter (S.W.¼) of section nineteen north range eight (8) W. I. M. Garfield county.

"To Russell Knott,          "Russell Knott.

"Care, Liberty National Bank,

"Oklahoma City, Oklahoma.

"Send Additional requirements to_____."

As we view this draft, it was merely an option which these men obtained in this matter without paying a cent for it, under which they could tie up this title for at least 60 days for the expressed purpose of examining the title and curing its infirmities, if any. In our opinion, its real purpose was to tie up this title for 60 days so that they might have ample opportunity to go out and find somebody who would purchase it at a profit to them.

As stated, these papers were placed in escrow April 16, 1929. On May 3, 1929, Knott's lawyer, Cromwell, went to the bank, took down these papers which were in escrow without any notice to plaintiff, and promptly recorded the royalty deed and oil and gas lease. He also deposited $200 to her credit, which she has never touched. About that time the plaintiff noticed in the newspaper that the oil and gas lease had been recorded. She immediately went to the bank and complained of the violation of the escrow agreement, and was told by the young woman that Knott had paid $200 for her at the bank, and that she, the young woman, "supposed that was all the plaintiff wanted," and so gave the escrow papers to Cromwell. The plaintiff's suspicions being thus aroused, she went to the courthouse and found out that not only was the oil lease recorded from her to Knott, but a royalty deed purporting to convey a half interest of the minerals underlying this land was also recorded. Therefore, the plaintiff brought this suit at once.

The plaintiff testified that she never discussed the giving or selling of any royalty deed to Knott and never knew she had signed a royalty deed until she saw the record thereon in the county clerk's office.

While, of course, the testimony of the defendant and his witnesses differs materially with that of the plaintiff, we are not impressed by it. We think the testimony of the plaintiff herself is convincing and is corroborated by a good many circumstances. Immediately after she signed these instruments she did what Knott and Osborn in their interview with her said she should do, that is, brought suit (April 17, 1929) in partition in the district court to acquire the one sixth outstanding interest in the title to this lease then vested in her minor son. This, we think, is strong proof that her agreement with them was what she said it was,—that she would make an oil and gas lease, and the same should be escrowed for 60 days so that she could acquire this outstanding interest. She testified that they told her that she would get $200 bonus on the lease and $160 a year rental for ten years. They stated in their testimony that they were not endeavoring to buy the oil and gas lease at all, but were simply buying a royalty deed for $200.

The method by which the attempted escrow was made by Knott's lawyer appears to us to be an unfair imposition upon this woman. He simply had the papers sealed in an envelope, wrote something on it, and later went there in her absence, took down the papers and delivered them to his client, and then lost the envelope. Since, at the time these papers were signed, plaintiff did not have her glasses, she could not read these instruments, and since he did not read them to her and fully explain them to her, we think it was his plain duty to either insist that she call in her lawyer or at least to read these papers to her and then prepare a formal escrow agreement to be signed by both her and Knott.

It is contended by counsel for the royalty company that under the terms of the draft deposited in escrow with the lease and royalty deed, Knott's attorney, Crom-

well, had the right at any time that Knott was satisfied with the title and put $200 in the bank, to go to the bank and take down these escrow papers without the knowledge or consent of the plaintiff. We do not think so. As indicated above, we are satisfied that the real understanding between the parties was that the papers were to be escrowed 60 days to give her time to complete partition proceedings, which she promptly brought.

The evidence shows that this draft served no purpose and was not employed according to its terms. It was drawn on an Oklahoma City bank, and its terms contemplated that it should be indorsed by the plaintiff and put in a local bank for collection. There is nothing in that instrument which provides that at any time that Knott was satisfied with the title he could draw down these papers, nor do we think that the language quoted by counsel occurring in the draft supports this contention. It reads:

"The maker hereof agrees to furnish said requirements, if possible, within the time last specified (probably 60 days), and further agrees to accept money in case the draft is paid at any time before same is ordered returned by the forwarding bank."

The evidence, as stated, is that this draft was never paid or was never forwarded to any bank.

In fact, Knott admits that they always put one of these drafts with escrowed lease papers, and after concluding the title was good, they consummated the transaction, not by using the draft, but by paying the purchase price into the escrow bank in favor of the lessor. We consider, therefore, that the language of the draft on this proposition is entirely immaterial.

Without attempting to analyze this testimony on this point more minutely, we are content to say that in our opinion the proof of fraud is clear and convincing, and that both the royalty deed and the lease were procured by fraud by Knott and Osborn, and by the acts of their lawyer; that the judgment of the trial court on this point is correct; and that the papers were taken out of escrow in violation of the actual agreement between the parties.

2. The Equitable Royalty Company was not an innocent purchaser of the undivided half royalty deed.

We have tried to make it clear from the foregoing discussion that the agreement between the plaintiff and Knott relative to the oil and gas lease and the royalty deed was that the same should be placed in escrow for 60 days from April 16, 1929, to enable her to bring suit in partition against the minor heir and so acquire his one sixth interest. She brought such suit in the district court April 17, 1929, and obtained her judgment of partition July 2, 1929. We have also shown that we think it was the agreement of the parties that these papers so placed in escrow in the bank should not be taken down without her consent; that in violation of this agreement Cromwell, the attorney for Knott, without any authority from plaintiff, went to the bank on May 3rd, took these papers out of escrow, and either filed them or had them filed for record on the same date. Shortly thereafter, about April 30, 1929, the defendant, Knott, conveyed this undivided one-half royalty interest to one Deaton. Deaton then conveyed the same interest to the intervener, the royalty company, on May 7, 1929, and the royalty company claims to be an innocent purchaser of this interest.

We do not think so. When Knott, through his attorney, wrongfully broke the escrow agreement and took down the lease and royalty on May 3rd, without consent of the plaintiff, and without her knowledge, such act was in violation of the escrow agreement and no title to the property described in either of such instruments passed to Knott. As no title passed to Knott in the royalty, he had no title to convey to Deaton. Therefore, Deaton had no title to convey to the intervener, the royalty company. Our court has held this over and over again, and we take it to be settled law in this jurisdiction. Hunter Realty Co. v. Spencer, 21 Okla. 155, 95 P. 757; Taylor v. Harkins, 74 Okla. 206, 178 P. 117; Hallam v. Bailey, 66 Okla. 46, 166 P. 874; Heath v. Burnham-Munger-Root Dry Goods Co., 74 Okla. 186, 177 P. 606; Board of Commissioners v. Little, 80 Okla. 45, 193 P. 986; Eason v. Walter, 118 Okla. 37, 246 P. 865.

In the case of Wood v. French, 39 Okla. 685, 136 P. 734, this court said:

"Where the grantor retains the actual possession of the land, although such possession is not notice of his adverse claim of ownership, his escrow deed is invalid to transfer any right, in the absence of performance of condition; and the wrongful yielding of possession of such deed to grantee by the depositary transfers no title, even though the claimant thereunder be an innocent purchaser for value."

In this connection, it may be well to call

the court's attention to section 5045, C. O. S. 1921 (sec. 9466, O. S. 1931):

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

With reference to this statute, it will be borne in mind that both the oil and gas lease from Mrs. Perry to Knott and the royalty deed from her to him were between the same parties, executed on the same day, and acknowledged by the same notary, and related to the same piece of property. We take it that those two instruments, therefore, are to be construed as though one instrument.

The lawyer, Cromwell, mistakenly testified that the oil lease and the royalty deed were "not related in any way." The following language occurs in the mineral deed given by plaintiff to Knott:

"Said land being now under an oil and gas lease executed in favor of Russell Knott, it is understood and agreed that this sale is made subject to the terms of said lease," etc.

The court has construed the above statute in a long line of cases, which cases, we think, support our contention: Crowder v. James, 110 Okla. 214, 236 P. 891; Canadian Coal Co. v. Lynch, 28 Okla. 585, 115 P. 466; Kokomo Oil Co. v. Bell, 81 Okla. 247, 198 P. 326.

In Aetna Life Insurance Co. v. Bradford, 45 Okla. 70, 145 P. 316, it is held:

"Where a contract is executed which refers to and makes the conditions of another instrument a part of it, the two will be construed together as the agreement of the parties."

See, also, Brake v. Blain, 49 Okla. 486, 153 P. 158; Kelly v. Baughman, 66 Okla. 200, 167 P. 80; Nelson v. Golden, 84 Okla. 29, 202 P. 308; Continental Supply Co. v. Levy, 121 Okla. 132, 247 P. 967.

Such being the case, Knott had no right to take the oil lease or royalty deed out of escrow until she had by her suit in partition acquired the outstanding one-sixth interest of her boy, as she did later by the decree of July 2nd.

One Lewis, president of the royalty company, testified and stated that Deaton offered to sell him an oil lease and the royalty deed; that he refused to buy the oil lease because of the one sixth outstanding interest in the minor and for other reasons carefully set forth by him in a written opinion; that he did buy for the royalty company the undivided one-half interest in the royalty because Mrs. Perry then owned five-sixths of the fee, which was more than one-half interest in the royalty underlying the 16-acre tract of land. Independent of the escrow proposition discussed above, we think he is in error when he said he had a right to buy an undivided half of her five-sixths interest in the royalty, because that is not what he attempted to buy. Her royalty deed to Knott, which came to the royalty company by assignment, purported to convey an undivided half interest in the entire royalty underlying this whole tract of 160 acres. This we conceive to be a very different thing from an undivided half of the royalty underlying five-sixths of the land.

3. The trial judge held that the probate records and other court records in evidence below, and to which Lewis made specific reference in the written opinion which he gave the royalty company, were sufficient to put the royalty company on notice of certain defects and infirmities in the title; that it was the duty of the royalty company in ordinary prudence to search out the infirmities suggested by such records, and that if it had so done, it would have discovered the fraud perpetrated upon the plaintiff by the defendant Knott and his associates, as well as the unlawful manner in which the actual escrow agreement was broken. We agree with this. The rule on this subject was well stated by this court long ago in the case of Daniel v. Tolon, 53 Okla. 667, 157 P. 756.

"A purchaser of lands, who buys in reliance upon the record title, is chargeable with all the notice brought to him by the records; and if the record contains matters that would put a person of ordinary prudence upon inquiry into the nature of the title of the grantor, or of the rights, and equities of a former owner, then the law charges such purchaser with all the knowledge an inquiry upon his part, prosecuted with reasonable diligence, would have brought home to him."

For all of the reasons above discussed, and others which space will not permit us to enumerate, we are satisfied that the judgment of the trial court was right, and that it should be, and it is hereby, affirmed.

The Supreme Court acknowledges the aid of Attorneys C. A. Dickson, A. D. Cochran, and Charles B. Steele in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme

Court. After the analysis of law and facts was prepared by Mr. Dickson and approved by Mr. Cochran and Mr. Steele, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.