The OKLAHOMA COMPANY, a corporation, Plaintiff in Error,

v.

Eugene J. O'NEIL et al., Defendants in Error.

No. 38178.

Supreme Court of Oklahoma.

Dec. 2, 1958.

Rehearing Denied Dec. 23, 1958.

Application for Leave to File Second Petition for Rehearing Denied Jan. 6, 1959.

536

Charles Hill Johns, Gomer Smith, Jr., Anita Ellerbee, Oklahoma City, for plaintiff in error.

G. C. Spillers, G. C. Spillers, Jr., Tulsa, for defendants in error.

PER CURIAM.

This case arises out of the acquisition of ownership of fractional interests in the working interest of three oil and gas leases, known respectively as the Kane lease, the Kane B–1 lease, and the Longbone lease, the last named being an Indian departmental lease. These three leases combined cover the entire Northeast Quarter of Section 3, Township 25 North, Range 13 East, Washington County, Oklahoma. There is also involved a controversy concerning the development and operation of said leases after the title to and ownership thereof was acquired by the parties here involved. Plaintiff below, and plaintiff in error here, is an Oklahoma corporation engaged in buying and selling interests in oil properties and developing and operating same. The defendants, and defendants in error here, are all non-residents of Oklahoma; defendants O'Neil and McCusker are experienced business men; defendants Mac-Smith, C. C. Alexander, Johnson, Lyle A. and Marguerite D. Titus, husband and wife, Evans and Krauss all live in Florida, Alexander and Evans being experienced business men there, and defendants Johnson, Lyle A. Titus and Krauss being retired experienced business men. All of said defendants were in the higher income tax brackets and were interested in investing in the working interest of producing oil and gas leases because of the income tax advantages which could be obtained in charging off development and operation expenses of the leases and depletion allowance on the income therefrom. We will hereafter refer to the parties by their trial court designation.

Plaintiff instituted this action in the District Court of Washington County, alleging that it was the owner of $\frac{5}{20}$ths of the working interest in said three leases and that defendants collectively were the owners of the remaining $\frac{15}{20}$ths of the working interest; that by agreement of all the parties plaintiff was the operator of such properties, and as operator it had incurred certain expenses in the drilling of wells, completing and bringing same to production, and in the operation of said leasehold estates. That it had paid more than its proportionate share of such costs and defendants had failed and refused to pay their respective proportionate shares thereof. The amounts allegedly due from each of said defendants, based upon their proportionate interests in said leasehold estates, were set out, and plaintiff prayed for judgment against each of said defendants for the amount alleged to be due from said defendant, for a lien for such amount against the respective interest owned by said defendant, for foreclosure of such lien with attorney's fees and interest. Collectively, plaintiff sought to recover from all defendants the total sum of $45,009.50. During the trial on the merits plaintiff reduced its claim and amended its petition to seek a total judgment in the sum of $35,364.56.

Defendants filed their answer and cross petition alleging that they had been induced to purchase their respective interests in the working interest of said leasehold estates by fraud of plaintiff in that plaintiff, acting through its president Westcott, and his wife, who was secretary of plaintiff corporation, represented to defendants that the working interest in said leasehold estates, upon which there were then producing wells, could be purchased for $125,000, and that by dividing such purchase price into ten shares each defendant could purchase an interest therein on a partnership basis on the basis of $12,500 for each one-tenth share, and that defendants purchased their respective interests from plaintiff and paid plaintiff therefor on such basis, but that plaintiff, without the knowledge of defendants, purchased said leases for the sum of $85,000; that at the time defendants purchased their respective interests from plaintiff, plaintiff represented that the leases had an income capacity of $10,000 per month, which representation was false and made

with the intent to deceive defendants; that to induce defendants to purchase their respective interests plaintiff caused an engineering report to be made which gave a misleading and untrue impression as to the monetary recovery which could be expected from the leases; that plaintiff represented that the engineer who made the report was fair and impartial, which was untrue because said engineer received a commission for negotiating the sale of these properties; that plaintiff misrepresented the condition of the equipment on the leases; that without the knowledge of defendants and prior to assigning them their respective interests therein, plaintiff caused a one-thirty-second override to be carved out of the Kane and Kane B–1 leases and had same assigned to a third party in trust for plaintiff; that plaintiff after assigning defendants their respective interests delayed in securing division orders thereon in order to conceal the actual production from the leases and to induce defendants to agree to drill additional wells thereon; that plaintiff billed defendants for sums in excess of the actual cost of drilling and operation of said leasehold estates; that plaintiff had removed oil from said leases and used same in hydrofracing adjoining leases and had removed equipment from said leases without accounting to defendants for same. In the first count of their cross petition defendants prayed for rescission of the entire transaction and for return of the total amount which each defendant had advanced to plaintiff for the purchase price and drilling and completion costs. In the second count they prayed that a receiver be appointed to operate the leasehold estates. In the third count defendants prayed that in the event the court should not grant rescission of the entire transaction, that they have an accounting from plaintiff as to all sums actually spent in the development and operation of the property.

Plaintiff filed its response denying that it was guilty of any fraud whatever; alleging that if it had, which it denied, defendants had affirmed the transaction after learning of the facts which they now alleged to be fraud and were thereby estopped to seek rescission; that defendants had received and retained oil runs from the leases; that the property had been so changed by the drilling of four additional oil wells and one salt-water disposal well that it could not be placed in status quo; that defendants had stated no grounds entitling them to appointment of receiver, and under the inconsistent reliefs prayed for by them they had no right to a receiver and the court had no power to appoint a receiver until after trial on the merits.

The court first held hearing upon defendants' application for a receiver, and after hearing voluminous testimony appointed a receiver over the property. Thereafter plaintiff filed its motion to vacate such appointment, which was overruled. Upon trial upon the merits, the court heard voluminous testimony, some of which concerned the alleged fraud practiced by plaintiff both in the acquisition of the property and in the operation and development thereof, but the most of which concerned the accounting phase of the lawsuit. At the close of all the evidence, the court made numerous findings of fact and conclusions of law, both as to the amounts proved to be due plaintiff from defendants on the accounting phase, which amounts the court reduced because a part thereof represented bills which plaintiff had not yet paid, and as to the issue of rescission. In accordance with its findings of fact and conclusions of law, the court entered judgment granting defendants rescission of the entire transaction, ab initio, finding the amount which each defendant had advanced to plaintiff in the whole transaction, and rendering judgment in favor of each defendant against plaintiff for such amount with interest and impressing a lien upon the property in defendants' favor to secure such amounts, revesting title to the property in plaintiff but continuing the receivership, and awarding attorney fees in the amount of $6,000 to defendants' attorneys. From order overruling motion for new trial plaintiff has perfected this appeal, alleging numerous assignments of error.

■ Under the issues drawn by the pleadings the first and paramount question presented to the court was whether defendants were entitled to rescind the contract by which each defendant acquired his ownership of an interest in said leasehold estates on the ground of fraud. It is elementary that fraud, when proven, vitiates any contract ab initio, and if defendants were able to prove such fraud on the part of plaintiff in the acquisition of their respective interests in and ownership of said leasehold estates, so as to entitle them to rescind such transaction, then such transaction and such contract would be entitled to judgment against plaintiff for all moneys paid by them to plaintiff in the purchase of their respective interests, together with any other sums advanced by them for drilling and completing additional wells, as for money had and received. In such event, the court might properly, in aid of its judgment, have appointed a receiver of the property to protect defendants' judgment lien; and also, in such event, an accounting by plaintiff to defendants of the moneys actually spent by plaintiff in the drilling and completion of wells and operation of the leasehold estate would be completely unnecessary, because defendants, having been granted rescission, would own no interest therein and could not be concerned with any costs arising out of the development or operation of the leasehold estates.

■ On the other hand, if defendants were not entitled to rescission of the contract by which they acquired their ownership of fractional interests in the leasehold estates, and therefore had and owned an interest therein, then they would have been entitled to an accounting from plaintiff as operator of the leases for the money actually spent in the development and operation thereof; and also, in such event, and upon proper showing as to waste, or mismanagement, might have been entitled to a receiver pending such accounting being made. In this connection, it is to be noted that defendants did not seek as alternative relief ouster of plaintiff as operator (which would have had the effect of rescinding the contract by which plaintiff became the operator of the lease, without disturbing the contract by which they acquired ownership of their respective interests); the relief they sought was a rescission of the "entire transaction," that is, the voiding of the contract by which they acquired ownership of their interests in the leasehold estates which would, of necessity as above stated, carry with it return of all moneys paid by them to plaintiff.

■ Instead of determining this crucial and decisive question, the trial court first held a hearing upon defendants' application for appointment of a receiver. At that hearing defendants produced voluminous evidence, some of which went to the question of whether plaintiff had misrepresented the potentialities of the leases when defendants bought their interests, but most of which concerned errors and alleged misrepresentations made by plaintiff to defendants in billing them for their proportionate parts of development and operation costs of the leases, after defendants had acquired their ownership therein and after by written agreement of the parties plaintiff had become the operator of the properties. Plaintiff at that hearing put on no evidence but took the position that as of that time, until trial upon the merits and decision of the question of rescission of the entire transaction, the court had no legal grounds upon which to base the appointment of a receiver. At the conclusion of the hearing the court appointed a receiver of the properties. As one ground for reversal here, plaintiff urges such action as error, and that the appointment of a receiver was wrongful. We deem it unnecessary to pass upon that point at this time; suffice it to say that under our view of the basic question here presented such appointment of receiver, at the time it was made, was at the very least premature.

At the trial on the merits voluminous testimony, both documentary and oral, was introduced by both sides, including re-introduction of almost all the evidence which had previously been introduced on hearing for appointment of receiver. Much of the

oral testimony is in conflict, and much clearly incompetent and hearsay. By far the greater portion of the evidence went to the question of an accounting as between plaintiff as operator of the properties and defendants as owners of interests therein as to the amounts actually owed by them for development and operational costs. To detail the evidence of the respective parties would unduly prolong this opinion.

Upon the decisive question here involved, that is, whether defendants were entitled to rescind the initial transaction by which they acquired their respective ownership of interests in the property, the evidence reasonably tends to show that defendant Byron Evans had become acquainted with Harold Westcott and his wife, president and secretary respectively of plaintiff, some two or more years before the time of the events here involved; that Evans was owner of a successful automobile business in Florida and had capital which he wished to invest in producing oil properties because of the tax advantages accruing thereto and had invested in certain properties which plaintiff owned and operated; that said Evans had a wide acquaintance of persons in Florida and elsewhere who also had capital which they desired to invest in order to secure the most advantageous return thereon while at the same time secure advantageous income tax reductions thereon. That in return for a carried interest in certain leases and wells owned by plaintiff, and as recompense for his services, he had secured, from among his acquaintances, certain other investors in properties owned by plaintiff, among them being defendant Krauss. On May 21, 1956, Evans was in Oklahoma City and was a guest in the Westcott home. Defendant Krauss and his wife also happened to be in Oklahoma City, en route to Missouri to attend the graduation of their daughter from college. One Levine called at the Westcott home to see Harold Westcott and told Westcott that he had come across a valuable 160-acre lease in Washington County that had six producing wells on it; that the owner (whose name as far as the record shows was not at that time

mentioned) was in financial difficulties with the Department of Internal Revenue and had to sell the lease at a sacrifice to obtain money with which to satisfy the tax liens or else lose the property at foreclosure; that the lease had one well drilling and five or six locations which could be drilled and be profitable; that, as shown by the pipeline run tickets for the preceding month of April which Levine had with him, four of the six wells which had been operating the entire month had produced 2,600 barrels and two wells which had produced for only five days of the month had produced 480 barrels, which gave the lease an income of slightly over $10,000; that it was possible to purchase the lease for $125,000, and that the lease was worth more than what was being asked for it. Evans overheard the conversation and became very interested in it. The next evening when Evans, Westcott and his wife were having dinner with Krauss and his wife, it was suggested that Westcott tell Krauss about the matter, which he did. Krauss became very enthusiastic and asked Westcott why he did not buy the lease, and Westcott stated that plaintiff had so much of its capital invested in other properties that he did not want to buy it at that time, whereupon it was suggested that the deal could be broken up into tenths, and others interested in buying a share, Krauss stating he would take a tenth and naming various acquaintances of his and Evans who might be interested in investing in the lease. Krauss called defendant O'Neil long distance and told him about the deal, and defendant O'Neil stated he would be interested in buying an interest in the property. Before the party broke up, it was decided that Evans would return to Florida the next day to see if he could get his friends there interested in investing; Krauss stated he would invest but would have to wait until he returned home to send in the purchase price of his interest, and Westcott, who had never seen the lease, would inspect same and try to buy it.

Evans left the next day for Florida, taking with him the information as to the

previous month's oil runs, map of the location of the leases, and various data as to deductions allowable on income tax on investments in oil properties. Evans was allowed to testify in detail as to his conversations with the various defendants in Florida whom he interested in buying an interest in the deal. All of this testimony was clearly incompetent as being hearsay and admittedly outside the presence of plaintiff or its president. Be that as it may, it clearly appears that Evans did tell all the other defendants (except O'Neil, Krauss' friend in Massachusetts, and McCusker, O'Neil's friend who invested along with O'Neil when O'Neil told him about the matter) in Florida about the deal, and they became interested and defendants Johnson and Mr. and Mrs. Titus gave their checks to Evans for their proportionate part of the purchase price of $125,000 which checks Evans forwarded to plaintiff; O'Neil and McCusker sent their checks to plaintiff direct; defendants C. C. Alexander and MacSmith, along with Elwood Evans (who later resold his interest to plaintiff and is not involved in this suit) decided to come to Oklahoma to inspect the property before investing in it, which they did, on or about May 28th. Meanwhile, Westcott had inspected the property and had obtained a report from one Howard Alexander, a petroleum engineer, as to his opinion as to the oil reserves under the lease and his estimate of the primary recovery and secondary recovery. Upon the arrival of defendant C. C. Alexander, MacSmith, and Elwood Evans in Oklahoma City, Westcott introduced them to the petroleum engineer, Howard Alexander, and all of them went to inspect the lease. Westcott told them that they should not take his opinion as to the value of the lease but should rely upon the advice of the petroleum engineer in making their decision as to whether to invest. After inspecting the lease, talking to the petroleum engineer and seeing his report and questioning him about it, C. C. Alexander, MacSmith and Elwood Evans decided to invest in the deal and before leaving Oklahoma City gave plaintiff their checks for the interests which they desired to purchase.

The report of the petroleum engineer, which defendants C. C. Alexander and MacSmith saw before deciding to invest, states that the two Kane leases are subject to a 1/32nd override; that the estimate of primary recovery was 196,000 barrels, which figure contemplated the drilling of additional wells; that the net recovery to the working interest, less the overriding royalty and two oil payments, was estimated at 193,000 barrels, and that by waterflooding after the primary recovery was exhausted additional secondary recovery could likely be made; and that two of the wells had used tubing in them.

Meanwhile and thereafter, Wescott continued to negotiate with the owner of the lease, one Reames, and the brokers to whom Reames had given the exclusive right to attempt to sell same, namely, said Levine and said petroleum engineer, Howard Alexander; finally, plaintiff was able to buy the leases for the price of $85,000 net to Reames, plaintiff to take care of said broker's commission; as to said brokers, plaintiff offered to give them as their commission either the oil runs for the month of June or $10,000, and they elected to take the $10,000. On June 5, 1956, Reames assigned the Longbone lease to plaintiff and assigned the Kane leases to Colfax Oil Company, of which broker Levine was president and sole owner; the next day, June 6th, Colfax assigned the Kane leases, reserving a 1/32nd override, to plaintiff, which said override was thereafter assigned by Colfax Oil Company to a third party. On the same day plaintiff paid Reames the $85,000 net to him, and the $10,000 commission to brokers Levine and Alexander.

Thereafter, on June 11, 1956, plaintiff executed to each defendant identical assignments covering the interest which each had purchased. The assignments as to the Indian lease, the Longbone, was on the form approved by the Department of Interior and was subject to approval of such department and had to be cleared with it. As to the

assignments of the Kane leases, the assignments specifically stated that same were made subject to oil payments of record, and subject to an overriding royalty of $\frac{1}{32}$nd of $\frac{7}{8}$ths of all the oil and gas produced in favor of Colfax Oil Company. On June 18, 1956, plaintiff prepared a memorandum of agreement which set out that plaintiff was the owner of oil and gas mining leases covering the entire Northeast Quarter of Section 3, Township 25 North, Range 13 East, subject to an overriding royalty of $\frac{1}{32}$nd of $\frac{7}{8}$ths on the Kane lease, an oil payment of approximately \$1,200 out of $\frac{1}{16}$th on the Kane lease, and an oil payment of approximately \$1,700 out of $\frac{1}{8}$th on the Longbone lease, theretofore reserved; that it was the purpose of the agreement to provide for the drilling of a well upon said lands and for the acquisition by the party of the second part (separate identical memorandums of agreement were made with each defendant, said defendant in each case being second party) of an undivided interest in said well and said oil and gas mining leasehold estate. Numerous provisions follow, covering the manner in which plaintiff, as operator, shall proceed to drill and complete further wells and as to how non-operators (defendants) shall each pay their proportionate part thereof. The concluding paragraph of this instrument provides:

> "The parties declare and state that it is not their intention hereby to create a partnership, a co-partnership or mining partnership, or to permit such relationship to exist by reason of their *common ownership* of the oil and gas leasehold estates which is the subject matter hereof, or any other cause, and to this end it is specifically agreed that the rights, privileges, duties and obligations of the parties arising from any partner, co-partner, or mining partner relationship, which might arise from their entering into a contract governing the operation and development of said property, *or from any other fact, shall be superseded* entirely by the rights, privileges, duties and obligations of the respective parties, as set forth in this contract." (Emphasis ours.)

The assignments above mentioned, and two copies of the said memorandum of agreement were mailed by plaintiff to each of defendants on June 18th, together with a covering letter of transmittal, which states in substance that if these documents reflected the agreement of the parties and met with their appproval, to sign one copy of the memorandum of agreement and return same to plaintiff and to retain the other copy of same for their files. Each and every defendant signed said memorandum of agreement and returned same to plaintiff. Each defendant admitted that he received same in the mail, that he read same before signing it, that he signed it and mailed it back to plaintiff, and that from the time he received said instruments in the mail until after he had read, signed and returned same, he had no communication whatsoever with plaintiff or with anyone representing or purporting to represent plaintiff.

The above evidence is all that in any way relates to defendants' acquisition of their respective interests in these properties. Subsequent events, after plaintiff began the development and operation of the properties under this contract, are not material as to the basic question here presented. Defendants predicate their whole case for rescission upon the theory that it was represented to them and they understood that they were investing therein as mining partners; that plaintiff, as their mining partner or joint adventurer, was under a fiduciary duty to them, and was bound to advise them of the fact that it was able to purchase the property for a less sum than what was at first demanded as the purchase price; that plaintiff was under a duty to advise them that it had purchased the property for a net sum to the owner and had assumed the burden of satisfying the brokers for their commission on the sale, over and above said net sum to the owner; that plaintiff, as their fiduciary agent and partner, should not have obtained an engineer's report on the property from one who, al-

though a licensed engineer, was interested in selling the property and in obtaining a commission for negotiating a sale thereof; and that plaintiff should not have allowed or caused an overriding royalty to be carved out of two of the leases before assigning defendants their interests therein; that by concealing such facts from defendants plaintiff had breached its fiduciary duty as a partner and defendants were entitled to rescind on the ground of fraud. Defendants try to avoid the effect of the written agreements which they signed by stating that they were unfamiliar with the oil business, did not fully understand the agreements and did not know what an overriding royalty was, even though it was clearly set out in all the written instruments sent them and executed by them.

■ Regardless of what the preliminary negotiations might have been, or what the discussion might have been as to how the property would be acquired and thereafter operated, defendants cannot avoid the fact that they signed written instruments which clearly state that they are owners of the property as tenants in common, that they are not partners or mining partners therein, and that said written agreement superseded entirely any other agreement or relationship which might in any way have theretofore existed between the parties. The evidence clearly shows that each defendant understood that under the rulings of the Department of Internal Revenue that mining partners had to capitalize drilling and development costs, while tenants in common could charge off one hundred percent of drilling and development costs as same accrued; that each defendant wanted to take advantage of such tax deduction, and did not want to be mining partners with plaintiff for that reason. Defendants cannot be tenants in common and obtain income tax deductions thereby and execute written agreements to that effect so as to allow them to make such deductions, and at the same time be mining partners with plaintiff in order to impose upon plaintiff a fiduciary duty in the acquisition of this property so as to reap an additional financial

advantage. They cannot change their legal relationship to plaintiff, at their whim and as it suits their financial advantage of the moment, in derogation of their written contracts.

After the deal was first presented to each defendant, not one of them ever inquired of plaintiff what the actual purchase price and other costs incident to acquisition were; not one inquired as to the title of the property; not one objected to the presence of the overriding royalty on the Kane leases, which was fully disclosed to them. In that connection, each of defendants testified that they merely assumed that such overriding royalty was already a burden on the property when plaintiff bought it; in other words, they did not object to the overriding royalty as such, and would have no objection if it had been on there when plaintiff negotiated to buy the leases, but what they object to is the fact that it was carved out of the property after plaintiff began negotiating for it. Each of the defendants clearly understood that he was buying a certain fractional interest for a set price, and he knew that he was buying same, and intended to buy same, as a tenant in common.

■ Defendants offered no evidence of any kind to show that the interest which each bought in the property was not worth the sum which he paid for same. The only evidence on the point is that the report of Howard Alexander, the petroleum engineer, showed an estimated primary recovery of approximately 190,000 barrels of oil; another report made by one Kennedy, a geologist, which showed approximately the same amount of recoverable oil, and which report plaintiff did not know of until after it had purchased the property and assigned defendants their respective interests therein, and which report was never shown to defendants; and the fact that the production from the leases for the month of April, 1956, which defendants saw before purchasing an interest therein and from which each made his own arithmetical calculation of the monthly income which he could expect from the property, was what is

known as "flush" production, and that the production could be expected to decline and level off in succeeding months, as it did, thus decreasing the rate at which the oil could be recovered and therefore the monthly income but not decreasing the total recovery to be expected from the property. Such evidence clearly is no evidence as to fraud or misrepresentation as to value. It is well known that oil properties are speculative in nature and that the amount of return on investment therein, depends on many contingencies which cannot be foreseen or accurately predicted; factors may develop which greatly increase the value of the property and the return on the investment far beyond what could have been predicted, and likewise factors may develop which will entirely destroy any value which the property might have. Any statement as to the amount of recovery, or the speed of recovery, or the probable income from oil property is necessarily of a speculative character and mere expression of opinion. Myers v. Chamness, 114 Okl. 220, 245 P. 879.

We have heretofore held that mere advancement of money by several persons toward and to finance the purchase of undivided interests in oil and gas leases and royalties does not, standing alone, constitute them joint adventurers in the acquisition of same, even where the profits are to be divided between the operator and the persons advancing the money; and that when the parties to such a transaction agree in writing as to the respective interests which each has in such properties and the amount which each owed or was to advance in connection therewith, that the relationship between the parties was that of tenants in common, not joint adventurers, in the property which had been acquired. Feagin v. Champion, 195 Okl. 116, 155 P.2d 518. The written contract in this case is much more explicit than in the Feagin case, because in this case the parties specifically state that they have a common ownership of the property and are not partners or mining partners.

■ Defendants have wholly failed to sustain the burden of proving the necessary elements of fraud in the acquisition of their respective interests in the property, namely: that a material representation was made; that it was false; that when it was made the speaker knew it was untrue or that it was made recklessly without knowledge of its truth and as a positive assertion; that it was made with the intention that it should be acted upon, and that it was acted upon by the party to whom made, to his damage. Fraud is never presumed but must be affirmatively proven, and all of its elements must be established, the absence of any one of them being fatal. Without regard to whether the evidence might to some degree sustain one or more of the elements above set out, defendants wholly failed to prove that they were damaged in the purchase of these interests; nowhere did they prove that the interest purchased was not worth the sum paid. At most, the evidence merely shows that defendants had not, up to the time this suit was filed, received the monthly income from the property which they had calculated they would receive when they bought it. In other words, they were not receiving as fast a return upon their investment as they had hoped and desired. Such fact does not constitute fraud.

■ In the absence of fraud, all previous oral discussions are merged into and superseded by the terms of an executed written agreement and its terms cannot be varied by parol testimony. 15 O.S.1951 § 137; Enola Oil Co., Inc. v. Bogie, Okl., 290 P.2d 763; Clayton v. Paul, Okl., 292 P.2d 405, and numerous other cases cited therein and announcing the same principle. This court has specifically held in Dawson v. Sears, 188 Okl. 544, 110 P.2d 910, that in the absence of fraud or mistake the acceptance of a deed or writing in contravention of a prior oral agreement amounts to a modification of the former agreement. If defendants really thought that they were being offered a chance to invest as mining partners, when they accepted the assignments of their interests and executed the

written contract which stated that they were not partners, they effectively modified and changed any prior oral agreement which they had or thought they had, and they cannot now attempt to vary the terms of such unambiguous written document by parol testimony. Defendants were not entitled to rescind the contracts by and under which they acquired their respective ownerships in the property here involved.

Having decided the basic question, upon which depends all the respective rights of the parties, the other contentions of plaintiff in error need not be discussed at any length.

Inasmuch as defendants are owners of interests in the property, and are not entitled to rescind such ownership, they are entitled to an accounting. This they had, at great length and in minute detail. Defendants offered an immense volume of evidence concerning items upon which they claimed they were overcharged; items which they claimed were improperly charged to them; items which they claimed had been removed from the property without their consent and no credit given them therefor; and certain items which they claimed they were not liable for at all. After the receivership hearing, and prior to and during the course of the trial on the merits, an auditor employed by defendants and plaintiff's bookkeeper made a complete check of all the books of plaintiff pertaining to all transactions had by plaintiff in connection with the drilling of wells, completion of same, and operation of the leases after same were acquired by the parties. Many errors were found, both in favor of plaintiff and in favor of defendants; as to some of the transactions, to which defendants violently objected, plaintiff withdrew its claim for reimbursement therefor and thereby eliminated same from the lawsuit. As to all the others, the two auditors agreed that there was an aggregate sum due plaintiff from all defendants in the amount of $35,364.56, the specific part thereof owed by each defendant being agreed to and set out. Plaintiff amended its petition to con-

form to this proof and to pray for recovery of such sums so found to be owed by each defendant, aggregating said total sum. It appears that included in such sum were certain liens for labor and materials which had been filed against the leasehold estate, as well as other bills which plaintiff had not paid, amounting to approximately $9,000. It may be that since the trial in this case the receiver, who has continued to operate the property pending this appeal, has paid some or all of such bills out of the income from the property, and if so defendants are entitled to be given credit for such sums. Such matters will have to be determined by the trial court upon proper hearing had thereon.

Plaintiff has asked that, in the event of reversal of the trial court's judgment, this court fix and award plaintiff's attorneys fees for their services rendered both in the trial of the case and on appeal. It is evident that inasmuch as defendants were not entitled to rescind this transaction ab initio, and inasmuch as the trial court found that on the accounting phase, unless they were allowed to rescind, that defendants owed plaintiff a definite sum, less the unpaid bills, that defendants are not entitled to recover their attorney fees against plaintiff, and that plaintiff is entitled to recover its attorneys' fees against defendants. Inasmuch as the trial court will have to conduct further hearings to determine what bills, if any, included in the amount which defendants owed plaintiff but which plaintiff had not paid, have been paid by the receiver during the pendency of this matter on appeal, the amount of fees to be awarded plaintiff's attorneys is a matter to be decided by the trial court upon proper evidence as to the value thereof, both in the original hearings had in the trial court, the services rendered on appeal, and the further services to be rendered in the trial court.

The judgment is reversed and the cause remanded, with directions to the trial court to conduct hearing to determine what bills, if any, included in the sum of $35,364.-

shown by the accounting to be owing to plaintiff from defendants, have been paid by the receiver during the pendency of this appeal, and to give defendants credit for any such bills so paid; to render judgment in favor of plaintiff and against each defendant for each defendant's proportionate part of such sum due and owing, less credits for paid bills as above stated; to fix and award plaintiff's attorneys a proper fee for their services in the trial court and on appeal and in the further hearing to be had on this matter; and to give plaintiff such other relief as it may be entitled to receive, consistent with the views herein expressed, including interest on the sum due plaintiff from the date the judgment herein was originally entered.

Reversed and remanded with directions.

WELCH, C. J., CORN, V. C. J., and DAVISON, JOHNSON and CARLILE, JJ., concur.

HALLEY, WILLIAMS, BLACKBIRD and JACKSON, JJ., dissent.

HALLEY, Justice (dissenting).

I am compelled to dissent. Although the original action in this case was filed by the Oklahoma Company the transaction out of which the case arises was master-minded by Harold Westcott, the President of Oklahoma Company. Westcott and his wife own all the stock in this company except one qualifying share.

Westcott was an experienced oil man of the promoter type. Working under the guise of a friend he fast-talked some of the defendants into purchasing interests in the oil and gas leases involved in this action. They paid $12,500 for a tenth interest. These particular defendants got friends to invest in the deal. Westcott represented it would take $125,000 to buy the leases but stated if he could buy them for less he would do so. He bought them for $85,-000 but told one or more of the defendants that he was unable to buy for less than the $125,000. $10,000 was paid to two men,

Levine and H. C. Alexander, for assistance in making the purchase of the property. The propriety of this expenditure is exceedingly doubtful. To say the least, Westcott expended for the leases $30,000 less than what he represented.

This was a joint adventure from the start and Westcott was to operate the leases.

The evidence is clear that no sooner than Westcott began operating the properties he began to defraud his partners, the defendants herein, in such operations. The most blatant conduct in this phase was the attempt to charge $3 a foot for drilling certain wells when the actual cost was $2.

The Oklahoma Company sued originally in this action for $45,000 for the expense in operating the lease and the trial judge found the amount due to be $25,467.93. This amount did not credit the defendants with the sum that was due them because of the overcharge on the purchase of the leases originally.

The majority opinion justifies the unconscionable conduct of Westcott by saying that the defendants signed an agreement which relieves the Oklahoma Company from Westcott's overreaching. Plaintiff was and is still responsible for his acts. The defendants did not know at the time of signing the agreement that they had been defrauded. They were still under the impression that Westcott was honest and that they were dealing with a friend. They did not know that the geologist whom Westcott represented as a disinterested scientist was to share in $10,000 if and when they put up their money. They did not know that a one-thirty-second interest in their purchase was given to Whit Ingram without their consent and without consideration. There was nothing in these agreements that showed in any way that the defendants knew of or condoned Westcott's conduct.

The defendants reposed trust and confidence in the integrity of the President of Oklahoma Company, one Harold Westcott, and a confidential and fiduciary relationship

existed between the parties. See Fipps v. Stidham, 174 Okl. 473, 50 P.2d 680.

This memorandum agreement of June 18, 1956, did not cover the original transaction between the parties and was not intended to take the place of the previous negotiations having to do with the acquisition of the oil and gas leases. I say again, that at the time this agreement was executed the defendants were unaware of the fraud that had been perpetrated upon them and did not discover the fraud until after this action was filed.

The authorities relied upon by the plaintiff to the effect that a written agreement supersedes oral negotiation are all cases wherein there was an absence of fraud. Previous oral discussions are not merged into or superseded by the terms of an executed written agreement where there is fraud. Johnson v. Harris, 166 Okl. 23, 25 P.2d 1072.

The perpetrators of fraud should not escape liability by concealing their fraud until after a written agreement had been executed. Especially is this true where the memorandum agreement does not cover the original agreement. This agreement was only an understanding as to the operation of the leased properties.

Although this was a difficult case, it was capably tried by the judge and lawyers taking part.

The trial judge heard all of the testimony and was familiar with all the evidence. He entered judgment for the defendants. The great weight of the evidence sustains his decision. It should not have been set aside.

Due to the lack of confidence in Westcott this business cannot be carried on without a receivership. The only practical solution is to put the defendants back in their original situation. The entire transaction is so shot through with fraud and deception that I am of the opinion that the judgment of the trial court is the only way this case can be properly disposed of. To the judgment of the majority reversing the trial court, I dissent.