The OKLAHOMA COMPANY, a corporation,
Plaintiff in Error,

v.

Eugene J. O'NEIL, Paul T. McCusker, Gordon MacSmith, C. C. Alexander, Gustov A. Johnson, Lyle A. Titus and Marguerite D. Titus, Byron Evans, J. Arthur Krauss, and Sinclair Crude Oil Company, a corporation, Defendants in Error.

No. 38178.

Supreme Court of Oklahoma.

May 2, 1968.

Charles Hill Johns, Midwest City, for plaintiff in error.

Floyd L. Walker, Tulsa, for defendants in error.

AUSTIN R. DEATON, Jr., Special Justice.

This case was tried in the District Court of Washington County in July, 1957. The Plaintiff, The Oklahoma Company, appealed the decision of the trial court in favor of the Defendants to this Court. By a decision rendered in December, 1958. This Court reversed the judgment of the trial court and remanded the case with directions; Okl., 333 P.2d 534. Thereafter in April, 1967, on a bill of review brought by the Defendants, this Court recalled the mandate issued on January 6, 1959, in the former appeal and vacated the decision of this Court therein, directing the reinstatement of this case on the Court's docket for hearing and disposition on its merits. Okl., 431 P.2d 445. This decision is the result of the consideration of this cause by this Court following recent oral arguments and the additional briefs.

The Oklahoma Company, the plaintiff in the lower court and the plaintiff in error in this Court, is an Oklahoma corporation, engaged in the development and operation of oil and gas leases. Harold F. Westcott and Otha Westcott, husband and wife, were the president and secretary, respectively, and the owners of all except one of the outstanding shares of the corporation. The president of the corporation was its managing officer.

The Defendants were nonresidents of Oklahoma, and all of them were experienced and successful businessmen. However, none but Byron Evans had previously had more than casual experience in the oil and gas business. Evans had at that time been associated with the plaintiff in other oil and gas ventures, serving as contact man in locating purchasers to whom the plaintiff could sell undivided interests in leases to be developed. Evans received a consideration for such services and, to further his efforts, was listed on the plaintiff's letterhead as its vice-president, although he was never actually a vice-president of said company.

This case had its beginning on May 21, 1956, when Byron Evans, who was then visiting in the home of Harold F. Westcott, overheard one George Levine tell Westcott that he had knowledge of valuable oil and gas properties in Washington County that could be bought for a reasona-

ble price. On the following day these same oil and gas properties were discussed, pursuant to a suggestion by Mrs. Westcott, at a dinner attended by the Westcotts, Byron Evans and the defendant J. Arthur Krauss and his wife.

Harold F. Westcott explained that the Washington County properties had six oil wells producing from them, that the owner was having income tax problems and was willing to sell at a sacrifice price in order to raise money quickly. He also stated that there was a well then being drilled on one of the leases, that an engineer's report reflected the possibility of several other profitable locations and that he believed the leases to be worth more than the $125,000 price asked. Production from the leases was described by Westcott as having been in excess of 4,000 barrels during the month of April, which resulted in an income in excess of $10,000.

Westcott having indicated that the plaintiff was not then in a financial position that would permit it to purchase these leases, the parties considered the possibility of getting some of their friends to invest and jointly purchasing the leases. Before the meeting ended Krauss had agreed to purchase a one-tenth interest and had called the defendant Eugene O'Neil in Massachusetts and explained the proposition to him, as a result of which O'Neil agreed to purchase a one-tenth interest. Byron Evans agreed to take a one-tenth interest and stated that he would return to Florida to try and interest some of his friends in purchasing interests in the leases. Westcott agreed to take a one-tenth interest and explained that he would inspect the leases with an engineer whose report he had seen, determine the terms and conditions of the sale and try to buy the leases.

Upon returning to Florida on May 23, 1956, Byron Evans interested his friends, defendants Gordon MacSmith, C. C. Alexander, Gustov A. Johnson, Lyle A. Titus and Marguerite D. Titus, in the leases, using run statements and other data furnished by Westcott. As a result of Evans'

efforts all these persons agreed to participate in the joint purchase of the leases, Gustov A. Johnson taking a three-twentieths interest and each of the others taking a one-tenth interest each.

However, before finally agreeing to participate the defendants C. C. Alexander and Gordon MacSmith came to Oklahoma on May 28, 1956, to inspect the lease and check into the proposed transaction. They viewed the lease, talked to Westcott and interviewed the petroleum engineer, Howard Alexander, who had previously prepared an engineering report on the leases, and reviewed that report. On this occasion Westcott told the prospective investors that they should not be influenced by his opinion of value but that they should instead listen to Howard Alexander, the petroleum engineer, whom he represented to be unbiased and without prejudice. Before leaving Oklahoma these two defendants gave Westcott their checks in payment for their respective interests in the three leases.

The defendant Eugene O'Neil called Westcott on the day following his conversation with Krauss to confirm his understanding of the information about the leases. Upon being assured by Westcott that the statements made by Krauss were true O'Neil confirmed his intention to participate and agreed to mail Westcott the agreed contribution of $12,500. With Westcott's approval O'Neil stated that the defendant Paul T. McCusker wanted to share in the venture and would participate to the extent of a one-half of his interest. On May 24, 1956, O'Neil wrote to Westcott explaining his understanding of the entire transaction, including the purchase price of the leases, the monthly production and income, future development and other details. In this letter O'Neil quite emphatically stated that if the venture were not as he understood it to be and if he and McCusker each could not definitely be assured of $500 per month income then they did not desire to participate and their checks should be returned. Westcott merely acknowledged receipt of the checks.

By June 6, 1956, each of the defendants had agreed to participate in the lease venture and had paid the following sums for the interests designated:

| | | |
|---|---|---|
| Byron Evans | 1/10 | $ 6,250 |
| Eugene J. O'Neil | 1/20 | 6,250 |
| Paul T. McCusker | 1/20 | 6,250 |
| Gordon MacSmith | 3/20 | 18,750 |
| Gustov A. Johnson | 1/10 | 12,500 |
| Lyle A. and Marguerite D. Titus | 1/10 | 12,500 |
| C. C. Alexander | 1/10 | 12,500 |

J. Arthur Krauss had agreed to take a one-tenth interest and his payment of $12,500 was subsequently made to Westcott. Two other persons, Elwood Evans and Harry A. Finney, also participated to the extent of a one-twentieth (1/20) and a one-tenth (1/10) interest respectively and paid Westcott $18,750 as their share of the purported cost of the leases (the interests of these persons were later purchased by the plaintiff and they are, therefore, not parties to this action.) As previously mentioned Westcott agreed that the plaintiff would participate to the extent of a one-tenth interest. The cash contribution of Byron Evans was reduced by one-half by Westcott as a consideration for his efforts in enlisting the other Florida participants.

On May 28, 1956, Westcott, acting for the plaintiff, contracted to purchase the subject leases for $85,000 and agreed to pay a $10,000 commission to the two brokers who handled the sale. One of these brokers was Howard Alexander, the engineer represented by Westcott to be unbiased and without prejudice, and he later received the promised commission.

The purchase of the leases was actually completed on June 6, 1956. The owner assigned one of the leases directly to the plaintiff. However, Westcott directed that the other two leases be assigned by the owner to a third party on June 5, 1956, who in turn assigned the leases to the plaintiff on June 6, 1956, but reserving a 1/32 of 7/8 overriding royalty interest.

On the same day this overriding royalty interest was assigned to one Whit Ingram, the plaintiff's tax consultant.

The defendants were not informed of the true purchase price of the leases nor the circumstances attending the creation and ownership of the overriding royalty interest and did not learn of such facts until after this action had been instituted. The engineering report prepared by Howard Alexander on May 25, 1956, had reflected such an overriding royalty interest at Westcott's instructions, although the ownership of that interest was not specified.

Following its acquisition of title to the leases the plaintiff executed, delivered and subsequently recorded assignments by which the defendants acquired their interests. The defendants also signed an operating agreement which the plaintiff had prepared and mailed to them with their assignments. Both the assignments and the operating agreements mentioned the overriding royalty interest without details of its creation and ownership. Transfer orders from the purchasing oil company were not submitted by the plaintiff for the defendants' signatures until July and oil runs for the month of June were paid to the plaintiff.

Immediately upon acquiring title to the leases Westcott embarked upon a drilling program and in June, July and August, 1956, he drilled three oil wells and one water disposal well on the leases. During

this time he led the defendants to believe that the production of oil from the leases continued to be very good and that it was increasing with each new well. The defendants paid to the plaintiff certain funds at plaintiff's request to be applied to their share of operating and drilling expenses until they were finally alarmed about the plaintiff's conduct when he attempted to get them to pay their share of the broker's commission on the sale of the leases, and upon learning that the oil production was considerably less than they expected or than the plaintiff had informed them.

From that point on the relationship between the plaintiff and the defendants was less than warm and friendly. The plaintiff indicated through Westcott that it would purchase the interest of all dissatisfied owners. The interests of two owners were purchased and options taken on the remainder. The defendants ceased to pay their share of the expenses. In November, 1956, the plaintiff, being unable or unwilling to purchase the defendants' interests, instituted this action to collect more than $45,000 allegedy due it for past due expenses of development and operation and claimed a lien upon the leases in that amount, together with attorneys' fees and costs.

The defendants filed an answer and cross-petition alleging fraud by the plaintiff in the acquisition of the leases, in inducing the defendants to invest, in the development of the leases and in the management and operation thereof. The defendants sought the appointment of a receiver for the leases, rescission of the entire transaction, judgment for the amounts invested by the defendants or, in the alternative, an accounting.

Following a hearing on the defendants' application therefor the trial court appointed a receiver to manage and operate the leases. The subsequent trial of the action required several days during which the testimony of numerous witnesses was heard and voluminous written data offered in evidence; the case-made filed in this court is contained in four volumes and totals more than 3,000 pages of pleadings, exhibits and testimony.

The trial court entered judgment in favor of the defendants granting to the defendants a complete rescission of the entire transaction and entering a judgment in favor of the separate defendants for the total amount of their respective investments, less the amount of the oil runs received by each, and for a fee for the defendants' attorneys, all of which were made liens upon the three oil and gas leases involved.

The plaintiff appealed to this Court from an order overruling its motion for a new trial assigning twenty-nine separate errors as grounds for reversal. The plaintiff's argument in support of its appeal has however been advanced under only six propositions, which will be discussed in the order presented by the plaintiff.

The plaintiff first contends that fraud was not established by the defendants' evidence and that in the absence of such proof parol evidence was not admissible to vary or contradict the express terms and provisions of the written agreement signed by each of the defendants, in which there was a very exact and specific provision negating the possible assumption that the joint ownership should be interpreted to identify any type of partnership relation between the owners of the leases. The existence of fraud in the transactions between the plaintiff and the defendants is obviously of great importance in determining whether the trial court has by the alleged errors rendered a judgment requiring appellate correction. The rationale of the plaintiff's; argument is that if fraud was not established then the operating agreement was controlling and there was no mining partnership, joint adventure or any other type relationship which could have burdened the plaintiff's president Westcott with the duty of revealing pertinent facts and information regarding the leases.

By its argument the plaintiff urges that this Court should first determine whether fraud was proved by the defend-

ants, without regard to the question of the relationship existing between the plaintiff and the defendants. In our view a determination of these questions should be in the reverse order, for we believe, and this Court has often recognized, that a partner or joint adventurer occupies a fiduciary position with respect to the other members and owes a higher and greater duty to them than he owes to one with whom he deals at arms length. Martin v. Clem, 138 Okl. 245, 280 P. 826; Anderson v. Whitener, 127 Okl. 284, 261 P. 156; Dike v. Martin, 85 Okl. 103, 204 P. 1106; and, Rockett v. Ford, Okl., 326 P.2d 787. See also 54 O.S.1961, § 221, imposing such duties and responsibilities upon partners, and O. K. Boiler & Welding Co. v. Minnetonka Lumber Co., 103 Okl. 226, 229 P. 1045, and Commercial Lumber Co. v. Nelson, 181 Okl. 122, 72 P.2d 829, holding that the law of partnership is applicable to joint adventures.

 The well recognized requirements for determining whether a business relationship between two or more persons constitutes a joint adventure are that there must be a joint interest in the particular property or project involved, an agreement, either expressed or implied, to share in the profits and losses and acts or conduct reflecting cooperation in the project. Pfleider v. Smith, Okl., 370 P.2d 17, and White v. A. C. Houston Lumber Co., 179 Okl. 89, 64 P.2d 908. The trial court found that a mining partnership or joint venture existed between the plaintiff and the defendants and, unless that finding is against the clear weight of the evidence it will not be overturned by this Court, Sinker v. Johnson, 198 Okl. 343, 178 P.2d 608.

The testimony of various witnesses, including the plaintiff's president, Westcott, as well as numerous documents offered in evidence, clearly establish that the defendants Evans, Krauss, Johnson, Alexander and O'Neil, all of whom discussed the proposed purchase of the leases with Wescott, understood, believed and intended that the leases would be purchase by the group as a joint undertaking. This understanding and agreement was conditioned only upon the approval of other prospective participants and to Westcott's investigation of further details regarding the leases. The representations made by the defendant Evans to the remaining investors on his sales trip to Florida and their testimony regarding their intentions to participate in the venture establish that they too understood that the project would be a joint investment. Certain of the documents offered by the defendants in evidence were letters from the plaintiff's president which were addressed to the defendants as a group, or duplicate copies of which were mailed to all interest owners, and in which they were generally referred to as partners. There is no doubt that the first of our recognized tests for the relationship of joint adventurers was satisfactorily met by the defendants and properly recognized by the trial court.

What then of the second test, the agreement to share in profits and losses? That there was complete and wholehearted agreement to share in the profits certainly cannot be doubted, for when one considers the alacrity with which the defendants produced their checkbooks it must be supposed that only visions of sharing in unusual profits could have produced such unwonted conduct. Having thus agreed on this pleasant prospect it is not in the least surprising that there was no discussion of, much less agreement upon, the most unlikely possibility that losses could occur in an investment of this calibre. If the plaintiff would now complain of the parties' failure to consider and agree to share in possible losses it should remember that it was its president, Westcott, who so skillfully employed the misleading and tranquilizing information about oil production, net income, undrilled locations and bargain prices that even the most careful and prudent investor would have forgotten that losses can occur. Nevertheless, it is sufficient if it can be said that there was an implied agreement to share in the losses, and in light of the evidence we find that there was adequate basis for such a find-

ing. Wells v. Shriver, 81 Okl. 108, 197 P. 460.

The last of the three requirements is that there must be acts or conduct reflecting cooperation in the project. The only cooperation by the defendants reflected by the record in this case is the visit to and the examination of the leases by the defendants Johnson and Alexander, accompanied by Elwood Evans, one of the original investors, and Westcott, shortly prior to the purchase of the leases. Subsequent cooperation by the defendants appears to have been minimal because of the plaintiff's anticipation by correspondence and communications reflecting such progress and general optimism that all efforts to that end were effectively discouraged. It is also significant that none of the defendants were possessed of the knowledge or skills that would have led them to offer more cooperation in the development and operation of the leases. Recognizing this state of affairs the defendants left the management and operation of the leases to the plaintiff. This conduct amounted to cooperation under these circumstances, Albina Engine & Machine Works, Inc. v. Abel, 10th Cir., 305 F.2d 77 and United States Fidelity & Guaranty Co. v. Dawson Produce Co., 200 Okl. 540, 197 P.2d 978. We are in agreement with the trial court's conclusion that this was sufficient to satisfy this last requirement.

■ The parties being joint adventurers the plaintiff occupied a fiduciary position with respect to the defendants, as previously stated. The trial court found that the plaintiff was guilty of fraud in several respects because it had failed to discharge its obligations to the defendants. The plaintiff argues that the defendants' proof was an insufficient basis for this finding.

From the record it appears that the trial court based its finding of fraud upon the following facts, which has been admitted by the plaintiff or which are clearly established by the evidence:

1. The plaintiff represented that the purchase price of the leases was $125,000, and the defendants' contributions were based on this price, when the actual price was only $95,000, including the broker's commission.

2. The plaintiff failed to reveal to the defendants that Howard Alexander, the petroleum engineer who prepared an engineering report on the leases and upon whom some of the defendants relied for expert advice, was one of the brokers offering the leases for sale and who received a large commission upon completion of the sale.

3. The creation by the plaintiff of an overriding royalty interest to burden the leases and the assignment of that interest to the plaintiff's tax adviser as trustee for an unnamed person was not fully explained and the information furnished the defendants regarding this interest was misleading and deceptive.

4. The deliberate misrepresentation and concealment of facts and information regarding the production of oil from the leases by the plaintiff.

5. Repeated instances of deliberate falsification of expenses of development, operation and management, including the forgery of invoices and statements by the plaintiff's agents and employees.

The true facts concerning these matters remained unknown to the defendants until long after the purchase of the leases had been completed, the leases further developed and, in most instances, until a time subsequent to the institution of this action.

In view of the statutory definition of fraud in Oklahoma, 15 O.S.1961, §§ 58, 59, we hold that the evidence was more than adequate to support the trial court's finding of fraud.

The plaintiff next argues that one of the essential elements of actionable fraud was not established, alleging that there was no

proof offered by the defendants even remotely tending to establish that the interests acquired by the defendants in the leases were not worth as much as they had paid for them. Although the defendants did not, as pointed out by the plaintiff, offer testimony directly controverting the evaluation of the leases by the engineer Howard Alexander, there is a surfeit of evidence to establish beyond doubt that they were damages. The measure of damages to be used in this case is not to be determined by reference to the actual value of the leases at any given time, but rather to the purchase price thereof, as well as the intrinsic value of a one-thirty-second overriding royalty interest therein. The defendants may in fact have received undivided interest in some very valuable leases, but they were nevertheless damaged when they received less than they were entitled to have and for which they paid more than their fair share. That the plaintiff received its one-tenth interest in the leases at no cost, and that it did in fact make a profit from the defendants' contributions, is a very satisfactory basis upon which to conclude that the defendants were damaged.

The existence of the remaining elements of actionable fraud, falsity, materiality, knowledge, intent and reliance, not having been questioned by the plaintiff, we assume that it therefore shares our view that all requirements of proof have in these matters been properly and completely satisfied.

█ The memorandum of agreement dated June 18, 1956, and signed by each of the parties, specifically provides that it was not the intention of the parties to create a partnership, co-partnership, mining partnership or any similar relationship. The plaintiff insists that the defendants should have been bound by this agreement and that the trial court committed error in admitting evidence to contradict its specific provisions. The trial court obviously did admit much evidence offered by the defendants for the express purpose of explaining, varying and contradicting this written contract. This court has frequently recognized the parol evidence rule which the plaintiff seeks to rely upon here. However, only in the absence of fraud is this rule available to one asserting the validity of the written instrument. 15 O.S.1961, § 137; Enola Oil Co. v. Bogie, Okl., 290 P. 2d 763; Clayton v. Paul, Okl., 292 P.2d 405; Dawson v. Sears, 188 Okl. 544, 110 P.2d 910. Since we have previously determined that there was fraud practiced by the plaintiff in the entire series of transactions by which the defendants were induced to invest in the leases, we must affirm the trial court's decision to admit testimony to vary the terms of the written agreement.

█ The plaintiff's second proposition of reversible error is that the defendants waived any possible fraud by asserting ownership and dominion over the leases after learning of fraud and by seeking the appointment of a receiver.

The evidence in this case clearly establishes that the defendants knew nothing of the various fraudulent practices of the plaintiff's president until August, 1956, which was subsequent to the completion of the additional wells drilled by the plaintiff. Even then the defendants acquired no information regarding the more serious breaches of the fiduciary relationship. However, from that time it appears that the defendants' efforts were all directed toward attempts to extricate themselves from their follies, rather than toward increased dominion or assertions of ownership. Such attempts as the defendants undertook to try and avoid further difficulties and additional problems were not such that they can, under any theory of waiver or estoppel, have had the effect of preventing the defendants from claiming rescission based upon the plaintiff's fraud. The plaintiff's argument on this point is quite brief and no authority for its position is cited. Although the legal theories of waiver and estoppel are well recognized by this Court, we find that there is insufficient

evidence in this cause to warrant a lengthy and detailed refutation of this argument.

The only question remaining under this proposition then is whether the application for and the appointment of a receiver amounted to an affirmation of the entire transaction by the defendants. The plaintiff argues that by seeking the appointment of a receiver the defendants have made an election of remedies which precludes an accompanying claim for rescission. We cannot agree.

It is provided by statute in this state, 12 O.S.1961, § 1551, that:

"A receiver may be appointed by the Supreme Court, the district or superior court, or any judge of either, or in the absence of said judges from the county, by the County judge:

First. In an action by a vendor to vacate a fraudulent purchase of property, or by a creditor to subject any property or fund to his claim, or between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed or materially injured.

Second. In an action by a mortgagee for the foreclosure of his mortgage and sale of the mortgaged property, where it appears that the mortgaged property is in danger of being lost, removed or materially injured, or that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt."

" * * * Sixth. In all other cases where receivers have heretofore been appointed by the usages of the courts of equity."

In interpreting this statute this Court has held that a receivership is ancillary or auxiliary to proper equitable relief, that is, such relief is a provisional remedy granted only in connection with an action

for some other purpose. Harris v. National Loan Co., 169 Okl. 457, 43 P.2d 1038, and Fidelity Trust & Deposit Co. v. Certified Oil Properties, 189 Okl. 673, 119 P.2d 83. Therefore, it is not possible in this jurisdiction that a pleading seeking only the appointment of a receiver could invoke the jurisdiction of the court in which it is filed. As a necessary corollary, a count for receivership could not constitute an election of remedies, to the exclusion of the additional relief sought. This case is therefore distinguishable from the cases from other jurisdictions cited by the plaintiff, in which irreconcilable and inconsistent claims for relief, not including receivership, were involved. For the same reasons the cases Magnolia Petroleum Co. v. Quart, 200 Okl. 258, 192 P.2d 698, Hare Milling Co. v. Keys, 120 Okl. 217, 251 P. 77, Howe v. Martin, 23 Okl. 561, 102 P. 128, and Herbert v. Wagg, 27 Okl. 674, 117 P. 209, decided by this court are not in point.

This Court has previously adopted a test for determining whether a party should have been required to make an election of remedies which will serve equally well in this case. In Dudley v. King, Okl., 285 P.2d 425, we said:

"There are three essential elements of the doctrine of election of remedies, (a) the existence of two or more remedies, (b) inconsistency between the remedies, and (c) choice, with knowledge of the facts, of one of the remedies; and if any one of these elements is absent, the result of preclusion does not follow."

As we have previously pointed out, the plaintiff's argument does not demonstrate that these three elements were present in this case. An application for the appointment of a receiver is not of itself a substantive remedy under our law, also under the circumstances of this case there was no inconsistency in seeking a rescission as well as a receivership. The defendants were not therefore precluded from asserting claims to relief in this manner.

The evidence of the mismanagement of the leases by the plaintiff and of its attendant fraudulent practices, all of which were expensive and wasteful, was plentiful at the receivership hearing. In view of this evidence it would have been most unusual for the trial court to have refused to appoint a receiver. At that time it was impossible to know whether the defendants would be entitled to a rescission of their agreements with the plaintiff or only to an accounting. The trial court properly concluded that the defendants should not under such circumstances be required to stand quietly by and allow the leases to be further damaged and expenses increased while they awaited a decision on their claim for rescission.

It should be remembered that this action was commenced by the plaintiff, The Oklahoma Company, alleging the joint ownership of the leases and claiming a lien upon the defendants' interests therein in the sum of approximately $54,000. The defendants filed an answer and cross-petition seeking the appointment of a receiver, in addition to other relief. A receivership hearing was held prior to a trial on the other issues. The evidence at this hearing clearly revealed fraud and mismanagement in the operation of the leases that could easily affect their value. This evidence was also sufficient to reveal that a question existed concerning the plaintiff's right to a lien on the leases, and the learned trial judge doubtless recognized that upon plaintiff's failure to establish its claimed lien the defendants might well be entitled to a lien upon the plaintiff's interest in the leases, 54 O.S.1961, § 238; Hatten v. Interocean Oil Co., 182 Okl. 465, 78 P.2d 392, 116 A.L.R. 727; 42 O.S.1961, § 176; and Miller v. Liberty National Bank & Trust Co., Okl., 391 P.2d 269. We do not have the benefit of all the trial court's reasoning on this point but under the statutes and the decisions of this Court we must conclude that there was sufficient evidence to support the appointment of a receiver, and the problem was therefore within the trial court's discretion. Stovall v. Edwards, 194 Okl. 335, 151 P.2d 385.

The plaintiff also claims that granting rescission in this action was reversible error for the reason that it was impossible to place the plaintiff in its former position, because of the changes in the leases, and for the reason that the defendants did not act immediately upon learning of the fraudulent acts of the plaintiff.

As we have previously mentioned, the evidence in this case clearly reflects that the defendants did not learn of many of the plaintiff's fraudulent acts until after the date of the commencement of this action, November 15, 1956. The defendants filed their answer and cross-petition on February 8, 1957. Under the circumstances we are of the opinion that the defendants acted with sufficient dispatch after their investigation revealed the facts complained of in their pleadings.

It was of course impossible for the defendants to restore the plaintiff to the status quo at the time they filed their cross-petition seeking rescission, the leases could not be returned to the former owner, the four additional wells drilled by the plaintiff could not be overlooked or forgotten and the expenses of development and operation recovered. It would, of course, have been equally impossible for this to have been accomplished even a few days following the purchase of the leases for one well was shortly completed and another commenced. Therefore, the very nature of the properties involved rendered it impossible for the plaintiff to be restored to its former condition. In addition, the nature of the acts of fraud committed by the plaintiff contributed to the inability of the defendants to restore the status quo. Hallam v. Bailey, 66 Okl. 46, 166 P. 874. To impose an impossible condition such as this on the defendants as a condition precedent to rescission would be grossly unfair and inequitable and would have the effect of reducing this equitable remedy to an arithmetic formula which would drastically limit its availability. All that can reasonably

or in justice be required in cases such as this is that the persons seeking rescission reimburse the other party for all benefits they may have received. This the defendants offered to do and the trial court required that it be done. This was in our opinion sufficient, for the defendants were thus prevented from profiting at the plaintiff's expense.

■ Subsequent to the hearing on the defendants' application for the appointment of a receiver, and prior to the trial of the principal issues in this case, the plaintiff filed a verified motion asking the trial judge to certify his disqualification to try the remaining issues in the case. The basis for the plaintiff's motion was the judge's expression of an opinion on the question of the existence of a mining partnership or joint venture at the time of the appointment of a receiver. The language of the trial judge to which the plaintiff objected was:

"Unquestionably, from the evidence of both sides and the admissions in the pleadings the defendants own $15/20$ths of the working interest. It is a partnership affair. Under the working agreement, they have a voice in the affairs. At least, with plaintiff being operator, he was under a fiduciary relationship with them. There has been, to speak conservatively, a breach in the fiduciary relationship. There has been equipment removed from the property. There has been oil removed from the property for the purpose of hydro-fracing wells. And I will state from the court's own knowledge that that is not uncustomary in the oil business. There has been the expense of drilling a water disposal well over there on this quarter and used by adjoining lease holders with apparently no credit to defendants. I think for the protection of all the parties interested, it is incumbent on the court to appoint a receiver in this matter to take charge of the property and to operate the property * * *."

This motion was overruled by the trial judge and the plaintiff alleges that the refusal of the judge to disqualify was reversible error in that it denied the plaintiff a fair and impartial trial.

Objectively viewed the statement of the trial judge upon appointing a receiver reflects only a legal conclusion based upon the evidence offered at that hearing. Such an expression of opinion does not reflect "bias" or "prejudice" against the plaintiff, in the sense that those words are used to define the objectionable personal attitude that does disqualify a judge. A trial judge's rulings on preliminary matters must in every case reflect an opinion based upon law or fact concerning the problem then presented. This is the duty and function of a judge and such opinions cannot be used as the basis for his disqualification. This Court in the case Howard v. Stanolind Oil & Gas Co., 197 Okl. 269, 169 P.2d 737, said:

"A trial judge's opinion on a question of law does not disqualify him."

In this same connection the plaintiff argues that the trial court considered and prejudged the question of mining partnership or joint venture, which was one of the issues involved in the subsequent trial. The plaintiff's reasoning is that because the judge expressed the opinion that such relationship existed at the time of the receivership hearing and following the trial again made the same finding he must have prejudged the case out of bias or prejudice. Since we have previously considered whether the trial court's conclusion on this point was supported by the evidence, and concluded that it was, we can hardly see why the trial court's consistency should be held to be evidence of error. The plaintiff offered no testimony at the receivership hearing, and it is therefore hardly surprising that the trial court's opinion at the conclusion of that hearing supported the defendants' contentions. At the subsequent trial of this case there was sufficient additional evidence to warrant the trial judge's reaffirmation of the opinion previously reached. The trial judge did not "pre-

judge" he merely "judged," and that was his function.

The plaintiff also suggests that the findings of fact and conclusions of law made by the trial court are not supported by and are contrary to the evidence, and that such findings demonstrate an inflamed and prejudiced state of mind by the trial judge. In support of this theory it is argued that the trial court should not have permitted Byron Evans, one of the defendants, to testify concerning his conversations with other defendants when he went to Florida to try and sell some of his friends on the venture. The plaintiff objected to such testimony but it was admitted on the ground that Evans was then acting as the plaintiff's agent. The trial court subsequently included a finding of such agency in its findings of fact and conclusions of law. There was adequate evidence to support the trial court's conclusion as to this agency relationship even at the time of the plaintiff's first objection and it thereafter became even stronger. It was through the perhaps unwitting efforts of Evans that the plaintiff was able to defraud the other defendants so quickly and easily. Without this salesman, who was identified on the plaintiff's letterhead as its vice-president, although he never was, this case probably would not have been filed. The plaintiff cannot have and claim the benefits of Evans' services without having to answer for his false and misleading representations. Since he was acting as the plaintiff's agent in selling his friends on the venture his testimony concerning his representations to them was admissible. Terrell v. First National Bank, 204 Okl. 24, 226 P.2d 431; Acre v. Hart, 189 Okl. 349, 117 P.2d 116. On this point the case Williamson-Halsell-Frazier Co. v. London, 154 Okl. 24, 6 P.2d 671, cited by the plaintiff is not authority. That case holds only that a statement by one person that another is a partner is not admissible unless made in the presence of such other person.

The lengthy and detailed findings of fact and conclusions of law by the trial court indicate the care and thought exercised by the trial judge in reaching a decision in this cause, and we find them to be amply supported by the evidence. Included in the plaintiff's argument are references to alleged erroneous findings that could not, even if the plaintiff be correct, affect the weight and sufficiency of the evidence as to those decisive issues involved in this action. We have nevertheless examined all the trial court's findings and conclusions with considerable care and have concluded that the trial judge was not then inflamed or prejudiced against the plaintiff, as has been contended in the plaintiff's briefs.

 It is well settled that in cases of purely equitable cognizance coming to the Supreme Court on appeal, the entire record will be examined and the evidence weighed, but the judgment of the trial court will not be reversed unless it appears to be clearly against the weight of the evidence. Clayton v. Speakman, 182 Okl. 86, 76 P.2d 376; Payne v. Wade, 190 Okl. 222, 122 P.2d 144; Iven v. Roder, Okl., 431 P. 2d 321, and many other cases.

Having carefully considered all the arguments advanced by the plaintiff and following a careful reading and analysis of the evidence and testimony offered in all phases of this action in the trial court we have concluded that the trial court's judgment should be, and it is hereby, affirmed.

JACKSON, C. J., IRWIN, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD and BERRY, JJ., having certified their disqualification in this case, Honorable R. PLACE MONTGOMERY, Hobart, Oklahoma, Honorable ARTHUR G. Mc-COMAS, Elk City, Oklahoma, Honorable AUSTIN R. DEATON, Jr., Ada., Oklahoma, Honorable FRANK ELKOURI, Norman, Oklahoma, Honorable DALE F. RAINEY, Okmulgee, Oklahoma, and Honorable LEE B. THOMPSON, Oklahoma City, Oklahoma, were appointed Special Justices in their stead.

HODGES, C. J., LAVENDER, V. C. J., and McINERNEY, McCOMAS, MONTGOMERY, THOMPSON, RAINEY and ELKOURI, JJ., concur.